**VITOL TRADING S.A., INC., Plaintiff,**

v.

**SGS CONTROL SERVICES, INC., Defendant.**

**No. 85 Civ. 5270 (JMW).**

United States District Court, S.D. New York.

April 15, 1987.

Patrick Martin of Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for plaintiff.

Charles B. Updike, Mindy H. Stern of Schoeman, Marsh, Updike & Welt, New York City, for defendant.

WALKER, District Judge:

## INTRODUCTION

In this matter, tried to the court, plaintiff Vitol Trading S.A. Inc. ("Vitol"), an international trader of crude oil and petroleum products, claims that Defendant SGS Control Services, Inc. ("SGS"), an independent inspector of petroleum and other products, breached the duty of care it owed Vitol under a contract to inspect a cargo of naphtha. Vitol sold the naphtha to Sun Oil Trading Company ("Sun Oil") and shipped it from Fawley, England to Houston, Texas. But, following SGS's analysis, Sun Oil rejected it as off specification. Vitol was compelled to renegotiate a lower sale price and now claims damages from SGS. SGS denies that it breached any duty and asserts, in substance, that the inspection results were not inconsistent with the test method requested by Vitol and Sun Oil under the inspection contract. SGS also counterclaims for amounts owed by Vitol on its inspection contract and for damages to its reputation.

To decide this matter, the Court must resolve a series of highly technical factual

questions regarding the efficacy of specific chemical tests used to analyze the naphtha cargo in addition to its traditional tasks of evaluating the credibility of various witnesses, and reconciling their conflicting testimony. After an examination of the exhibits submitted by the parties and a careful assessment of the credibility of each witness, the Court concludes that SGS breached its duty to render a workmanlike performance in conducting chemical tests.

## FACTS

### I. *The Parties and Others*

Plaintiff Vitol, located in Stamford, Connecticut, is the United States branch office of Vitol S.A., a Swiss corporation headquartered in Geneva, Switzerland. In April of 1984, when most of the significant events in this case occurred, Vitol had recently begun trading European naphtha to parties in the United States.

Defendant SGS, a New York corporation, is one of many world-wide affiliates of Societe Generale de Surveillance S.A. ("SGS-SA") which coordinates the inspection activities of the affiliates.

SGS subcontracted the tests at issue in this case to Chromospec Corporation ("Chromospec"), a division of Core Laboratories, Inc. ("Core Labs"). Chromospec specializes in the testing of petroleum products and has its office and principal place of business in Houston, Texas.

Sun Oil, the buyer of the cargo at issue, is located in Wayne, Pennsylvania and is a trading subsidiary of the Sun Oil Company.

When questions arose as to the tests at issue, Vitol requested other inspection companies to conduct the same tests on its cargo of naphtha. These companies included Moore, Barrett and Redwood ("MBR"), the British affiliate of SGS-SA, as well as companies in the United States: E.W. Saybolt and Co. ("Saybolt"), Caleb Brett Inc. ("Caleb Brett"), and Champlin Petroleum Co. ("Champlin"). Each of these companies perform inspection services similar to those offered by SGS and Chromospec and each analyzed Vitol's cargo of naphtha subsequent to Chromospec's inspections.

### II. *The Science*

To understand the factual issues in this case, it is necessary to know something of the purpose of the chemical analysis performed on the naphtha cargo and the various methods used to perform such analysis. Pure naphtha is composed entirely of four family groups of hydrocarbon compounds, each with its own chemical structure characteristics: paraffins, olefins, naphthenes and aromatics. An analysis undertaken to identify and quantify the volume of each of these components in a sample of naphtha is known as a "PONA" or "PNA" analysis. Although the various test methods used in a PONA analysis are capable of determining other properties of naphtha, their purpose in this instance was to determine the combined percentage of naphthenes and aromatics ("N + A") present in the cargo. The significance of the N + A percentage, broadly stated, is that naptha possessing a higher N + A is more suitable use in the manufacture of gasoline as opposed to other petroleum products and hence is more valuable.

Every PONA analysis consists of three steps. First, the analyst must *separate* the more than one hundred different compounds in the naphtha sample. Next, the analyst must *identify* each compound as a member of either the paraffin, naphthene or aromatic families (olefins are so rare that, for all practical purposes, they may be disregarded). Finally the analyst must *quantify* the amount of each family type contained within the sample to determine the N + A percentage.

The test methods used in PONA analysis seem to be one form or another of two tests basic types: mass spectrometry ("MS") and gas chromagography ("GC"). In general, MS is conducted by injecting a sample into a high vacuum, high temperature chamber and bombarding it with electrons so as to break it into ionized fragments. The electrically charged ions are then separated according to their mass and focused on a target by a magnetic field. They are finally identified and quantified from the pattern created by the resultant plot of current versus mass. GC, on the

other hand, separates the different compounds in the sample by use of a heated tube or capillary column. The different boiling points of the many compounds in naptha cause them to leave the tube or "elute" at different times and enables the analyst to sort out and identify these compounds. Although MS tests were performed on the cargo at issue, it is SGS's GC test, performed by Chromospec, that is at issue in this case.

The GC test used by Chromospec in this case is of a type called Capillary Gas Chromotography ("Cap/GC"). Chromospec based its testing procedure upon a 1968 paper by W.N. Sanders and J.B. Maynard, the so-called Sanders and Maynard method. The Sanders and Maynard method, with some modifications, was used at Chromospec primarily for routine compositional analysis—breakdown of a sample into its different components—rather than for PONA analysis for commercial purposes. Chromospec preferred to do PONA analysis by MS, instead of GC, since it believed that MS produced more consistent results.

Chromospec's Cap/GC separates the components in a sample by using a capillary column 200 feet long and less than a millimeter in diameter, into which a tiny portion of the sample is injected. Chromospec's column is made of steel and its interior is coated by a thin film of a substance called squalene. The Chromospec laboratory technician injects the sample into the heated injection port located at one end of the column. Hydrogen is used as a carrier gas to push the sample through the column. Like the injection port, the column is heated and, as the gas passes it, the column temperature is raised. As this occurs, the individual compounds separate from one another and elute in a distinctive order. This occurs because each hydrocarbon compound possesses a characteristic boiling point and, as the column temperature increases, the molecules with lower boiling points move more quickly through the column and elute first.

One difficulty that Chromospec, along with all other companies running GC tests, experiences is the problem of co-elution. Co-elution occurs when compounds elute simultaneously and therefore cannot be individually identified. For PONA analysis, co-elution is not a concern if the technician can determine that the two compounds co-eluting belong to the same family type. If, however, the co-eluting compounds are of a different family type, the PONA analysis is necessarily obscured. Chromospec's system has less difficulty with co-elution than do the systems of many laboratories.

Once the compounds have eluted from the column the analyst identifies and quantifies them. They are identified by their time of emergence from the column since a particular compound will always elute at the same moment in time when run through the same column under a consistent heating program. To make these identifications Chromospec uses a Flame Ionization Detector ("FID"). In essence, the FID burns the eluted compound and converts it into an electrical charge, the strength of which is proportional to the amount of compound in the sample. The charges produced by the FID are then recorded on a gas chromatogram, a chart, as a series of peaks emerging from a constant base line.

The laboratory technician then identifies the specific components by comparing the places on which the peaks occur on the gas chromatogram with peaks on a gas chromatogram from a standard sample. He or she then compares the standard and the sample chromatograms in order to identify particular peaks as belonging to particular compounds.

Chromospec then uses an automated system to quantify the amount of each paraffin, napthene and aromatic. This is done by using a computer to calculate or "integrate" the area below each peak on the chromatogram.

Each of the various types of GC used by laboratories in Europe and the United States operates in accordance with the same general principles. However, laboratories differ in their use of detectors, temperatures, tubes, and coatings. Some use a series of columns packed with a solid substance; others use a complex combination of different tests to do some preliminary aromatic separation before using the GC to

complete the separation of naphthenes and paraffins; and still others use a mass spectrometer as a GC detector. Although the general principles behind the operation of each of these GC machines are the same, each lab performs this procedure in its own distinct way. Thus, it is common and expected for GC results to vary as between laboratories even on the same sample. The scientific community has yet to settle upon a single standardized procedure for performing GC tests.

### III. *The Events*

On April 4, 1984, Vitol entered into two contracts with Sun Oil. Under these contracts Sun Oil agreed to purchase two separate naphtha parcels from Vitol, parcels A and B. The parcel A contract specified that approximately 25,000 metric tons, or 7,985,883.36 gallons, of naphtha contain at least 45 per cent liquid volume of combined N + A. The contract price for parcel A was $.7925 per gallon. The parcel B contract specified a cargo weighing approximately 18,000 metric tons, or 7,194,387.48 gallons, with an N + A content no less than 35 percent liquid volume. The price for parcel B was $.7875 per gallon with a sliding scale to take into account the precise N + A content (between 35 and 40 per cent) as determined by the independent inspector. Vitol and Sun Oil orally agreed that GC would be the binding test method for both contracts.

In order to fill the Sun Oil contracts, Vitol mixed naphtha previously purchased in Balboa, Spain with higher N + A naphtha purchased from the Esso refinery in Fawley, England. The naphtha from Spain had been loaded on board the cargo ship M/T Randi Brovig ("Randi Brovig") on March 28, 1984 and had an N + A of between 33 and 37 percent determined by a British GC method called "IP/GC." This method involves a series of preparatory tests which first separate aromatics from the paraffins and naphthenes and then uses a form of GC to finish the PONA analysis.

The ship arrived in Fawley on April 2, 1984 and the Bilbao cargo was redistributed to permit the addition of naphtha with a higher N + A content in order to bring the two separate parcels up to the contract specifications. MBR, the British affiliate of SGS–SA, prepared a "hand blend" sample from both the Bilbao cargo and the Fawley shore tanks and jetty line. The "hand blend", intended to be representative of the cargo after mixing the Fawley naphtha with the Bilbao cargo, was used to determine the amount of Fawley naphtha needed in each tank to meet contract specifications. MBR ran an IP/GC test on the "hand blend" and measured the parcel A N + A content to be 48.26 per cent and parcel B to be 38.04 percent. MBR also tested a ship's composite sample after loading and it indicated an N + A content of 44.32 for Parcel A and 35.4 for parcel B. Although testimony is disputed on this point, the Court finds that it is more probable than not that the "hand blend" more accurately represented the true analysis of the Randi Brovig naphtha N + A content. The Randi Brovig sailed from England on April 8, 1984.

Shortly before the Randi Brovig arrived in Houston, Vitol learned of potential problems in matching American tests for N + A content with the test results from Europe. A separate naphtha cargo was being shipped for Vitol aboard another vessel, the Mosor Carrier, pursuant to a contract with Coastal States Trading Inc. ("Coastal"). The cargo had been loaded in late March of 1984 with an N + A of 42 percent, as tested by Texaco and witnessed by MBR. However, upon the ship's arrival in Corpus Christi, Texas on April 17, 1984, Caleb Brett, Costal's independent testing company, witnessed Coastal tests which showed an N + A of 37.88 per cent. SGS tested the cargo by MS and found the N + A to be 37.38 per cent. Caleb Brett then tested the sample itself and determined the N + A content at 33.02 per cent. Coastal then rejected the cargo, forcing a renegotiation that resulted in a reduced sale price.

After the Mosor Carrier experience, Vitol was concerned that the test in Houston might show the Randi Brovig cargo then on route to be similarly off-specification. Since Vitol had just recently begun to trade naptha, Vitol's operations manager, Neil Kelley was himself unfamiliar with efficacy

of naptha testing procedures. Since the cargo had been tested in England by SGS affiliate MBR, Neil Kelley contacted SGS in Houston for information on naphtha testing methods. The substance of this conversation is disputed. Linda Geiger, SGS's national lab manager, says that she gave Kelley a comprehensive explanation of European and American test methods using MS and GC, including her firm opinion that GC results were too inconsistent and hence unsuitable for PONA analysis. She particularly questioned its "reproduceability"—the margin of difference when different operators run the same sample through different machines. Geiger says she explained to Kelley that GC results would vary widely. Kelley, on the other hand, says that Geiger led him to believe that GC was the "state of the art" test method and the appropriate test to use in analyzing naphtha for $N + A$ content.

After evaluating the testimony of the witnesses and reviewing the documents submitted by the parties, the Court is convinced that Kelley simply misunderstood Geiger's explanation. A telex dated April 19, 1984 from Geiger to Kelley contains statements that could be read as consistent with a view that GC is a reliable test for PONA analysis. Yet, the telex specifically states that "reproduceability has been wide by experience" and that the test had not been standardized by any scientific organization. Geiger was knowledgeable and experienced in matters of petroleum testing and lacked any motive to encourage Vitol to use the GC method. Indeed, SGS itself had no facilities for running a GC test. The far more likely explanation for the inconsistency is that Kelley, whose naptha testing experience was virtually non-existent, was confused by the welter of scientific information given him by Geiger and failed to appreciate the drawbacks of using GC for naphtha analysis.

The written April 4 contracts between Sun Oil and Vitol did not identify a particular independent inspector or testing method. After receiving Geiger's April 19 telex indicating SGS's willingness to work with the London SGS–SA affiliate MBR in order to obtain similar results, Kelley requested

Sun Oil to agree to use SGS for the Houston testing and to use the GC method.

On or about April 24, 1984, Kelley contacted Geiger to inform her that Sun Oil and Vitol wanted to engage the services of SGS to inspect the Randi Brovig cargo. Again, the parties remember this conversation differently.

Geiger testified that she again warned Kelley of the GC's limitations for commercial testing and explained that SGS had no equipment suitable for a GC test. She told Kelley that GC work would have to be subcontracted. According to Geiger, she then transferred his call to someone who could take the work order and called Chromospec to inquire if it could perform the GC analysis. A Chromospec representative, Ngami Phan, told Geiger that Chromospec did own a GC but that it was not ordinarily used for PONA analysis. Chromospec used its column to run routine compositional analyses. Phan did tell Geiger that, if the client insisted, Chromospec could run a PONA on the capillary column. Geiger did not inquire further into the quality or the currency of the specific GC testing procedure at Chromospec, nor did she attempt to find any other laboratory that did PONA analysis by GC. Geiger says that she explained Chromospec's hesitation to Kelley and that he decided to go ahead with the tests. As the parties wanted quick results on the Randi Brovig cargo, it was agreed that Chromospec, not SGS, would also run back up MS tests in order to avoid sending the samples to SGS's mass spectrometer in New Orleans.

Kelley remembers the conversations with Geiger differently. He says that she did neither warned him of difficulties in obtaining comparable results with GC, nor explained that SGS would subcontract the tests to Chromospec. There is no mention of Chromospec in his notes of the conversation or in any of the contemporaneous telexes.

The Court need not resolve this particular conflict. In all probability the parties, again, misunderstood one another. In any case, since the Court concludes *infra*, that SGS could unilaterally delegate its testing responsibilities to another laboratory with-

out breaching any duty of care, even without informing its client as to the delegation, whether Geiger informed Kelly of the delegation is irrelevant. In addition, even had Kelley been so informed or told of the general difficulties in using GC for PONA analysis, he clearly was not told of any drawbacks associated with the specific Capillary Gas Chromotographer used by Chromospec since Geiger was unaware of them.

On April 24, 1984, Robert Wayne Tomlinson of Sun Oil telexed SGS to confirm the appointment of SGS as the independent inspector of the Randi Brovig cargo. The Telex instructed SGS to do the PONA analysis with a Cap/GC and to make an oral report of the results as soon as possible. The telex further noted that if Vitol also wanted an MS analysis, Sun Oil would accept one half of the charges.

The Randi Brovig arrived in Houston on April 24, 1986. SGS obtained samples on that date from the several tanks in the vessel. Chromospec prepared a ship's composite by weighing and blending the samples and then ran the PONA analysis using MS and GC. The MS tests came back first and determined the N + A content of parcel A to be 40.44 and that of parcel B to be 34.92. The GC test, however, showed parcel A at 36.76 and parcel B at 27.26. Geiger reported these results by telephone to both Tomlinson at Sun Oil and Vitol's Kelley. Kelley requested Geiger to recheck the results. She then asked Chromospec to investigate the analysis performed the previous evening. Chromospec reported back that the results obtained were correct by the method used. Vitol later requested that SGS re-run the Cap GC tests. This also was done by Chromospec with approximately the same results.[1]

On April 25, 1984, Sun Oil advised Vitol that it rejected the Randi Brovig cargo based on SGS's telephone report of the GC test results the previous day. Faced with demurrage charges accruing at a rate of $9,500 per day, Vitol had no choice but to

renegotiate. On April 27, Vitol and Sun Oil agreed to use parcel A to satisfy the parcel B contract and, on April 30, 1984, Vitol agreed to sell Sun Oil the parcel B naphtha at a price reduction of approximately 5.5 per cent.

After the cargo was unloaded, Geiger still had to decide which results to include in SGS's official report. Geiger was under pressure from Vitol to exclude the Chromospec results and from Sun Oil to report them. She also received conflicting advice from within SGS. After a futile request for an agreement by Vitol and Sun Oil as to which result should bind them, on May 8, 1984 she reported all the results without comment.

IV. *The Chromospec Capillary Gas Chromatography Method*

Notwithstanding the questionable reproduceability of GC testing generally, the Court finds that the Chromospec Cap/GC system was behind the state of the art. In 1984, Chromospec had no standard sample available for the detection of naphthenes composed of more than nine carbon atoms —known in the industry as naphthenes above n-nonane. A standard sample is run through a GC and its resultant chart consisting of known compound peaks can then be compared with the compound peaks on the chart from the unknown sample under test. In 1983, a standard sample sold by Transition Laboratories for $300–400 which could be used to identify several such compounds above n-nonane entered the market, but was not purchased by Chromospec. The standard sample used by Chromospec was created in 1981 and had not been changed. It appears that, since its system was not ordinarily used for commercial PONA analysis, Chromospec saw no need to update its standard to meet state of the art developments. The fact that Chromospec's Cap/GC could not identify these heavier naphthenes meant that there was a built-in margin of error of four to six per cent. More precisely, when a Chromospec

---

1. The disparity between the load port and discharge port results then generated a frenzy of re-sampling and retesting over the following weeks. Vitol shipped samples to England for testing by MBR using the IP/GC method and to

Saybolt and Champlin in the United States for testing by both GC and MS. In all cases, the Chromospec GC results were significantly below the results from other laboratories.

technician saw a peak he or she could not identify, the technician grouped the unidentified peak with the family of the nearest identified peak. Hence, unidentified peaks might be grouped with the wrong family type. Vitol's experts credibly testified that, indeed, Chromospec had misidentified a number of napthenes as paraffins in its analysis of the Randi Brovig cargo. These two facts, the lack of an up-to-date standard sample and the practice of arbitrary grouping of unidentified peaks, caused a greater discrepancy between Chromospec's results and those of other laboratories than could be explained by the poor reproduceability of GC testing in general.

Finally, as both SGS and Chromospec concede, Chromospec's Cap/GC system was neither designed nor generally used for PONA analysis. The defendant's own expert testified that someone on the Gulf Coast requesting a PONA analysis on a GC apparatus would have in mind one of three GC systems developed specifically for PONA testing. Chromospec's Cap/GC was not one of these systems.

### V. *The Positions of the Parties*

Vitol claims that SGS breached its duty of care in the following ways: SGS should not have delegated its duties under the contract to Chromospec without notifying Vitol of this delegation; in any event, SGS bears responsibility for Chromospec's work which was inadequate; and SGS should not have reported the Chromospec results without, at least, highlighting their questionable value.

SGS disputes each of Vitol's contentions. SGS argues that it had every right to delegate to Chromospec without prior notification to Vitol and, moreover, that Vitol knew at the time that SGS would make this delegation because Geiger had told Kelley of this. The use of the GC method was not SGS's decision. Vitol had chosen it despite Geiger's advice that the test was unsuitable for PONA analysis. In any event, the GC method used by Chromospec complied with acceptable scientific standards, was

**2.** While the parties did not address a choice of law question, their submissions appear to assume application on New York Law to the questions presented. Uninvited by the parties to do

correctly performed, and was no less reliable than any other type of GC. Finally SGS, as an independent inspector, had a duty to be completely neutral as between Vitol and Sun Oil. Since it could not find that the Chromospec results were categorically wrong or that the specified procedure had not been followed, SGS had a duty, in fairness to both parties, to report all the test results.

## DISCUSSION

### I. *The Report of Chromospec's GC analysis*

■ The Court finds no merit to Vitol's claim that SGS should not have reported all results without comment or qualification. SGS had a duty to both Vitol and Sun Oil to exercise due care in communicating the test results performed by Chromospec. As this duty ran to two parties, each with potentially adverse interests, the actions SGS could take in fairness to both parties were carefully circumscribed. SGS could not know with certainty that the Chromospec results were incorrect, and, therefore, could not ignore them without breaching its duty to Sun Oil. This Court finds that SGS met its duty of care in this regard.

### II. *Delegation of Work to Chromospec*

Vitol's contention that SGS improperly delegated its work to Chromospec is also meritless. Under New York law, applicable here, a contractual duty may be delegated to another, where the duty does not involve some distinctive or unique service that can only be performed by the original contracting party.[2] "In the absence of an express or implied provision to of the contrary, a contract, other than one which involves duties of such a personal or unique character as cannot be delegated, or of which assignment is prohibited by statute, may be assigned." *S & L Vending Corporation v. 52 Thompkins Ave. Restaurant Inc.* 26 A.D.2d 935, 935, 274 N.Y. S.2d 697, 698, (2d Dep't 1966). Accordingly, unless the inspection services to be per-

so, the Court has not performed any independent inquiry on this issue and accordingly, is applying the law of New York, the forum state.

formed by SGS were "personal" or "unique," they were delegable.

■ PONA analysis by GC for commercial purposes is not sufficiently "personal" or "unique" to prohibit delegation to another laboratory. The procedures for running such scientific tests can be properly performed by any skilled technician using appropriate methods and equipment. Hence, SGS could delegate the duty to perform GC tests to Chromospec.[3]

### III. *Duty to Render Workmanlike Performance*

■ In the final analysis, the disposition of this case rests on whether or not SGS, through its delegatee Chromospec, met the duty of care applicable to an independent inspection company performing a chemical analysis for commercial purposes. In New York a professional, tradesperson, or other worker performing under a contract that contains no provision governing the standard of care for performance, must nevertheless discharge his or her duties in a "workmanlike manner." *Lunn v. Silfies,* 106 Misc.2d 41, 431 N.Y.S.2d 282 (S.Ct. Allegheny Co. 1980).[4] Independent inspectors are not insurers of their work and cannot, therefore, be held liable solely on the basis of an undesirable or incorrect outcome. The worker, however, must complete the task with the due care and skill reasonably expected in the work of parties performing in the field.

Reasonable expectations, not perfect results in the face of any and all contingencies, will be ensured under a traditional negligence standard of conduct. In other words, unless the parties have contractually bound themselves to a higher standard of performance, reasonable care and competence owed generally by practitioners in the particular trade or profession defines the limits of an injured party's justifiable demands.

*Milau Associates, Inc. v. North Ave. Development Corp.,* 42 N.Y.2d 482, 486, 398 N.Y.S.2d 882, 885, 368 N.E.2d 1247, 1250 (1977); *Trans Caribean Airways, Inc. v. Lockheed Aircraft Service–International, Inc.,* 14 A.D.2d 749, 220 N.Y.S.2d 485, 486 (1st Dep't. 1961) (A person charged with performing work under a contract must exercise reasonable skill and care in performing the work and negligent performance of the work gives rise to actions in tort and for breach of contract); *See also Republic Corporation v. Procedyne Corporation,* 401 F.Supp. 1061, 1069 (S.D.N.Y. 1975); *Lonigan v. Queensboro Volkswagon, Inc.,* 89 Misc.2d 1018, 393 N.Y.S.2d 290 (Civ.Ct.1977).

■ In determining what constitutes reasonable skill and care in the context of this case, the Court looks to the business in which SGS is engaged and the reasonable expectations of parties who contract for independent inspection services. SGS holds itself out as an independent inspector capable of performing PONA analysis in a commercial context. Parties requesting chemical analysis to determine whether the commercial cargoes meet contract specifications are entitled to expect that the independent inspectors will use the most accurate and up-to-date methods available. Changes in technology are frequent in the field of chemistry. The frequency of change, however, does not excuse failure on the part of the chemist to reasonably

---

**3.** Vitol alleges that unusual circumstances exist in this case. Vitol claims that SGS should have known that Chromospec's GC system could not perform an acceptable PONA analysis. Therefore, according to Vitol, delegation to Chromospec without permission from Vitol after full disclosure of all relevant facts was improper.

Since the Court holds, *infra,* that SGS is responsible for the work done by Chromospec, this issue need not be addressed. If Chromospec met the applicable standard of care the delegation would not detract from SGS's exoneration. Alternatively, if Chromospec's work breached its duty, then SGS is responsible for it

regardless of the delegation. Hence, any possible duty on Geiger's part to question Ngami Phan closely about the nature of the GC machine used at Chromospec is irrelevant to the disposition of this case.

**4.** SGS urges application of the so-called "finality rule" which makes conclusive the decision of an independant inspector as between contracting parties absent a showing of fraud, bad faith or gross negligence. This standard is inapplicable here where at issue is not the liability of a contracting party but of the inspector itself.

keep pace with such change just as it does not excuse the negligence of the lawyer in failing to discover a recently decided and dispositive case or of a doctor in failing to apply new but accepted medical techniques. In the venerable, but still informative case on medical malpractice, *Pike v. Honsinger*, 155 N.Y. 201, 49 N.E. 760 (1898), the New York Court of Appeals concluded that a doctor is "bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the patient, will render him liable, however good his intentions might have been." *Honsinger*, 155 N.Y. at 210, 49 N.E. 760. In this case, SGS had a duty to keep abreast of new developments in the field that are in general use among other commercial inspectors.

■ SGS breached its duty to provide workmanlike performance because Chromospec, its delegatee, used a method, designed in 1968 solely for compositional analysis, to complete the PONA analysis requested by Vitol and Sun Oil.

As indicated previously, Chromospec's analysis of Vitol's naphtha was seriously defective. First, the Cap/GC apparatus could not identify naphthenes above n-nonane, in principal part, because Chromospec did not use the most recent 1983 standard sample sold by Transition Laboratories. Plaintiff's expert credibly testified that a system which cannot identify these heavier napthenes is deficient. He was corroborated on this score by the manager of Core Labs' own analytical chemistry division, of which Chromospec is a component. The inability to identify napthanes above n-nonane resulted in a four to six per cent reduction in Chromospec's analysis of the N + A content of the naphtha. Secondly, Chromospec used a system that was not designed for PONA analysis despite the fact that there were three Cap/GC systems commercially available that had been specifically developed for PONA analysis. Thirdly, there is also evidence, credited by the Court, that Chromospec misidentified a number of naphthenes as

paraffins. These deficiencies resulted in a total margin of error of up to ten per cent.

The Court concludes that a party requesting a PONA analysis for commercial purposes would not expect an independent inspector to use a system with deficiencies such as those inherent in Chromospec's apparatus. Put another way, the science of Gas Chromatography had outdistanced the technology used in Chromospec's laboratory for GC PONA analysis.[5] The Court, therefore finds that SGS, in using Chromospec's GC results, breached its standard of care to Vitol.

SGS would explain the variation between Chromospec's results and those of Champlin, Caleb Brett and Saybolt, as due to the inherent inconsistency of GC analysis, not to any deficiency in Chromospec's apparatus. Although evidence at trial demonstrated that, indeed, GC analysis often yields disparate test results, Vitol conclusively established that Chromospec's Cap/GC was systematically defective and that these defects caused a substantial reduction in the N + A found by Chromospec. Despite the fact that different laboratories often produce different GC results, Vitol was entitled to a test performed in a workmanlike manner. Vitol and Sun Oil may have bargained for an inconsistent test, but they did not bargain for an obsolete one.

## IV. Damages

■ The Court must determine the amount of damages to which Vitol is entitled as a result of SGS's breach. The general rule is that a party injured by a breach of contract for services may recover all reasonably certain damages flowing from the breach. *See Najjar Industries, Inc. v. New York*, 87 A.D.2d 329, 451 N.Y.S.2d 410, 414 (1st Dep't.1982), *aff'd, Najjar Industries, Inc. v. New York (Greenpoint Incinerator)*, 68 N.Y.2d 943, 510 N.Y.S.2d 82, 502 N.E.2d 997 (1986). "[T]he injured party should be placed in the same position it would have been in had the contract been performed." *Teacher's Ins. & Annuity Association of America v. Butler*, 626

---

**5.** The Court notes that all the evidence indicates that the apparatus was perfectly competent to perform the routine compositional analyses for which it was ordinarily used.

F.Supp. 1229, 1236 (S.D.N.Y.1986) (J. Weinfeld).

A damage calculation, therefore, should place Vitol in the same position as if Chromospec had properly performed GC tests with an up-to-date apparatus. Because Chromospec's results were substantially below specification, Sun Oil rejected the cargo and the two parties renegotiated a new contract price. The new price was lower than the contract price by $595,808. The delay in discharging the naptha caused Vitol to incur additional demurrage charges of $9,500 per day for a total of $45,790. Adding these two figures together, Vitol requests $641,598 as damages.

There is still a substantial question whether a properly run GC analysis would have shown the naptha to be on specification. The plethora of tests conducted on the cargo indicates that a hypothetical "true analysis" would have shown the cargo to be either just on or just off specification.[6] The so-called Minton report, prepared by plaintiff's experts, further confirms this finding. The finding receives further support from credible evidence that even properly performed GC tests may vary significantly.

■ This evidence of the naptha's quality coupled with evidence of the questionable efficacy of GC analysis in general indicates that Vitol is not entitled to the full difference between the original contract price and the renegotiated price. Vitol did not establish that a properly conducted test would necessarily have found the cargo to be on specification and that Sun Oil would have paid the full contract price for the naptha. The evidence, does demonstrate that, at worst, such a test would probably have indicated the cargo to be slightly off specification. If this were so, it is likely that Sun Oil would have successfully negotiated a slight price reduction. This requires a modest adjustment to the damage calculation in SGS's favor.

When the Mosor Carrier cargo proved to be off specification, Vitol and Coastal renegotiated the contract for a minor price reduction of $.011 per gallon. This contract modification serves as a reasonable benchmark for assessing damages with an adjustment to the contract price for diminished quality.

■ Although the parties dispute whether the naptha market was falling or rising at the end of April 1984, the Court concludes that it was sufficiently stable to warrant using the Mosor Carrier price reduction as an appropriate reference point for calculation of damages in this case. Accordingly, reducing the contract price for Parcel A by $.011 per gallon yields a price diminution of $87,845. Performing the same calculation for Parcel B, results in a reduction of $79,138 The total reduction is $166,983. Similarly, assumming a renegotiation based upon a GC result slightly off specification, it is probable that one day's demurrage would have occurred while the renegotiation occurred. Thus, the portion of the damage claim based on demurrage should be reduced by $9500. The Court, therefore, determines damages at $641,598 less $166,983 and less $9,500 for a total of $465,115 plus interest from April 26, 1984 to the date of judgment at 9 per cent.[7] Prejudgment interest totals $82,573.

### CONCLUSION

The Court concludes that SGS breached its duty of workmanlike performance in testing naptha for napthenes and aromatics when its agent and delegatee, Chromospec,

---

6. 

| Tester (Method) | Parcel A (N+A) | Parcel B (N+A) |
|---|---|---|
| Champlin (GC) | 45.76 | 31.09 |
| Saybolt (GC) | 45.64 | 44.11* |
| Caleb Brett (GC) | 44.14 | 36.76 |

\* There is considerable question as to the validity of this result. It has been stipulated that Mr. Zabihi of Saybolt, if called, would testify this result to be an error resulting from analysis of Parcel A sample as though it were that of Parcel B. The Court, accordingly, does not assign weight to it.

7. The Court is, of course, aware that this is not a precise calculation. Scientific rigor, however, in the calculation of damages is not required. *See Lexington Products, Ltd. v. B. D. Communications Inc.,* 677 F.2d 251, 253 (2d Cir.1982) (J. Lumbard) ("where a wrong has been done, the courts will endeavor to make a reasonable estimate of damages.")

used an outmoded GC apparatus incapable of identifying a significant number of napthenes. The Court also finds that there is a reasonable probability that a properly conducted test would still have found the cargo to be slightly off specification and therefore adjusts damages accordingly. Plaintiff is awarded $465,115 plus prejudgment interest of $82,573 or $547,688. All claims and counterclaims are dismissed.

SO ORDERED.