**VITOL TRADING S.A., INC.,**
**Plaintiff–Appellee,**
**Cross–Appellant,**

**v.**

**SGS CONTROL SERVICES, INC.,**
**Defendant–Appellant,**
**Cross–Appellee.**

**Nos. 54, 162, Docket 88–7384, 88–7386.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 31, 1988.

Decided April 21, 1989.

---

1. Our disposition of the case makes it unnecessary to address the parties' differences regarding safety and hygiene.

York City, of counsel), for defendant-appellant-cross-appellee.

Patrick V. Martin, New York City (Dana K. Martin, Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, of counsel), for plaintiff-appellee-cross-appellant.

Before FEINBERG, Chief Judge, and CARDAMONE and PRATT, Circuit Judges.

CARDAMONE, Circuit Judge:

SGS Control Services, Inc. (SGS) appeals from a judgment of the United States District Court for the Southern District of New York (Walker, J.) entered April 1, 1988, which awarded $547,688 in damages to Vitol Trading S.A., Inc. (Vitol) on the ground that SGS had breached its duty to render workmanlike performance while conducting chemical tests. Vitol cross-appeals seeking an increase in the amount of damages awarded it. Because, in awarding Vitol special damages, the district court applied an incorrect rule of damages, confusing plaintiff's failure to deliver a cargo that met contract specifications with defendant's test results that reported that failure, we must reverse. The cross-appeal is dismissed as moot.

## I FACTS AND PRIOR PROCEEDINGS

We assume the reader's familiarity with the district court's thorough recitation of the facts, *see* 680 F.Supp. 559, 560–66 (S.D. N.Y.1987), and substantially adopt them, setting forth only those necessary to make our holding intelligible and to explain the relationship between the parties.

The plaintiff Vitol, the seller in this action, is the American branch of a Swiss Corporation that is an international trader in petroleum products. It had recently begun trading European "naphtha" to buyers in the United States, one of which is the Sun Oil Company located in Wayne, Pennsylvania. At issue in this litigation are two shipments of oil products that Sun Oil, which is not a party to this action, purchased from Vitol. Appellant SGS, a New York corporation which is a branch of a

Michael E. Schoeman, New York City (Charles B. Updike, Thomas J. Dolan, Schoeman, Marsh, Updike & Welt, New

French testing concern, was jointly retained by Vitol and Sun Oil to test the contents of the two shipments in order to ensure their conformity with the sale specifications.

The cargo at the core of this appeal is naphtha, a substance resulting from the distillation of crude oil, which is used to make gasoline and petrochemicals. Its value varies with its chemical composition. The higher its content of the hydrocarbon molecules naphthene and aromatic (N & A), the more valuable it is because it is then refinable into gasoline. A method for testing naphtha's chemical composition is known as PONA analysis. SGS used two types of PONA analysis in this case: mass spectrometry (MS) and gas chromatography (GC). MS is generally considered to be the more accurate test because different laboratories employing the GC test often produce different results on the same naphtha sample.

Sun Oil entered into the subject contracts on April 4, 1984 to buy two parcels of naphtha from Vitol, as follows:

Parcel A: approximately 25,000 metric tons, minimum N & A content of *45 percent*, contract price of $.7925 per gallon.

Parcel B: approximately 18,000 metric tons, minimum N & A content of *35 percent*, contract price of $.7875 with a sliding scale of Naphtha content increased between 35 to 40 percent.

The seller and buyer orally selected GC as the test method that would be binding under both contracts, and designated SGS as the tester. Sun Oil confirmed by telex that SGS would test the naphtha by the GC method, and offered to split the cost of an MS test, if Vitol wanted an additional backup test.

To fill the Sun Oil contracts, Vitol used a cargo of naphtha that had originated in Bilbao, Spain and that was, at the time of contracting, at Fawley, England aboard the M/T *Randi Brovig*. After testing the cargo in England, additional naphtha was added to increase the N & A content and to bring the shipment up to contract specifications before the *Randi Brovig* set sail for Houston, Texas. When the *Randi Brovig* docked on April 24, 1984, Vitol was still concerned that the cargo would not meet the percentage of N & A required by the contract, and therefore asked SGS to run both tests on both parcels. The MS test results were obtained first and showed that the naphtha in parcel A registered an N & A percentage content of 40.44 and that parcel B registered 34.92. Both were below the specifications of 45 and 35 percent respectively. SGS telephoned these results to Sun Oil and Vitol.

The contractually binding GC tests also showed the cargo was below specification, but by an even larger margin. It revealed an N & A content for Parcel A of 36.76 percent and Parcel B of 27.26 percent. From Vitol's perspective, the GC test results looked worse. Retests produced similar, but not identical, results. The binding GC retest for Parcel A was 36.83 percent, and Parcel B was 27.57 percent—again, below the contracts' minimums. The MS retest for Parcel A was 41.9, and Parcel B was 35.58. Thus, only the non-binding MS retest for Parcel B met contract specifications.

Sun Oil rejected the cargo on April 26 based on receipt of the telephone report of the GC test results. Unable to find another buyer quickly—and facing $9,500 demurrage charges and lost interest of $2,500 per day—Vitol was forced to renegotiate the contracts with Sun Oil at distress-sale prices. Two days later Sun Oil and Vitol agreed that Parcel A would be used to fulfill the lower priced Parcel B contract. Vitol agreed to discount the former Parcel B at slightly over five percent, thereby enabling it to sell all of the cargo, but at less profit than it had anticipated under the original contracts.

As a result of its loss of anticipated profit Vitol sued SGS alleging negligence and breach of contract arising from SGS's failure to conduct the GC tests in a workman-like manner. The district court found that even given the problems of GC tests generally, SGS's subcontractor had failed to perform them adequately, and that its methodology was seriously defective. "Vi-

tol and Sun Oil may have bargained for an inconsistent test, but they did not bargain for an obsolete one." 680 F.Supp. at 568.

The trial court then calculated Vitol's gross damages to be $641,598: $595,808 for the price differential between the original and renegotiated contracts, and $45,790 for demurrage fees and interest. It then reduced Vitol's gross damages by $166,983, concluding that "Vitol did not establish that a properly conducted test would necessarily have found the cargo to be on specification and that Sun Oil would have paid the full contract price for the naphtha." *Id.* The district court bolstered its decision to decrease Vitol's award by stating as a finding of fact that "there is a reasonable probability that a properly conducted test would still have found the cargo to be slightly off specification...." *Id.* at 570. The phrase "reasonable probability" evidently reflects the non-binding MS retest result—which in contrast to all the other results in the "frenzy of re-sampling and retesting," *id.* at 565 n. 1—showed that there was enough N & A to meet the Parcel B contract requirements. The district court's finding that Vitol's cargo was "off specification" and therefore did not conform to the contract was not clearly erroneous.

## II DISCUSSION

### A.

New York law governs this diversity case. It classifies compensatory damages as either general (direct) damages—the fee SGS charged for the tests—or special (consequential) damages—the profit Vitol alleges it lost when it had to renegotiate the contracts with Sun Oil. General damages are those which are the natural result of the wrong and which the law presumes to have arisen from that wrong. These general damages must be traceable to and be the probable result of the injury. Special damages are not implied by law; they arise from the unique circumstances of the case. Such damages are awarded only when they are the natural result of the wrong and when they were within the contemplation of the parties at the time the contract was made. 36 N.Y.Jur.2d *Damages* § 10 (1984). Regardless of whether Vitol's complaint is read as sounding in contract or in tort, the same rule of damages applies. *See Kerr S.S. Co. v. Radio Corporation of America,* 245 N.Y. 284, 295, 157 N.E. 140 (Cardozo, C.J.), *cert. denied,* 275 U.S. 557, 48 S.Ct. 118, 72 L.Ed. 424 (1927).

■ We agree that in the present case SGS breached its duty of workmanlike performance. In reaching this conclusion, the district court applied controlling precedent under New York law, *see Lunn v. Silfies,* 106 Misc.2d 41, 431 N.Y.S.2d 282 (1980), and its careful findings on the limitations of GC tests generally and the deficiencies of the instant tests are amply supported by the record. Yet, proof of this breach of duty is not enough for plaintiff to succeed in its suit. New York law requires that for a plaintiff to prevail it must prove causation. For example, in the leading New York case of *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922) (Cardozo, J.), defendants were public weighers who the sellers hired to weigh bags of beans for the plaintiffs who were purchasing them. The weighers issued a certificate that inaccurately overstated the weight of the beans and, as a result, plaintiffs overpaid the sellers. The weighers were held liable to plaintiffs for the amount of overpayment. The damages flowed naturally from the inaccurate weighing and were therefore causally connected to it. *See id.* at 238–39, 135 N.E. 275.

Similarly, to meet the test of New York law, Vitol was required to demonstrate that if it had received an up-to-industry-standards test from SGS—one that accurately reflected the N & A content of the product—Sun would not have rejected the product, and Vitol would not have suffered a loss. But, here, the district court found that Vitol did not meet this burden. 680 F.Supp. at 569. It stated instead that "Vitol did not establish that a properly conducted test would necessarily have found the cargo to be on specification"; a "true test" "would probably have indicated the cargo to be slightly off specification." *Id.*

Thus, the loss Vitol sustained flowed not from anything SGS did or did not do, but from Vitol's tender of a nonconforming cargo. Even accepting the district court's finding that SGS breached its implied duty of workmanlike performance, the only effect of that breach was to create uncertainty about the magnitude of the naphtha's nonconformance. The GC tests and retests correctly ascertained that the cargo was N & A deficient and hence nonconforming. In this respect, SGS fulfilled its role as tester. To hold SGS liable for reporting that the naphtha was below specification is akin to killing the messenger bringing bad news.

We therefore cannot adopt the district court's conclusion that "[b]ecause Chromaspec's [SGS's subcontractor's] *results* were substantially below specification, Sun Oil rejected the cargo and the two parties (it and Vitol) renegotiated a new contract price." 680 F.Supp. at 569 (emphasis added). The trial judge's mistake, in our view, is in its use of the word "results." It was the percentage of naphtha in the cargo, not the test results, that fell below specification and caused Vitol's loss. For this, Vitol may blame no one but itself.

The bulk of Vitol's asserted damages—the diminution in the renegotiated contract's price—derives from Sun Oil's shrewdness. Without doubt Sun drove a hard bargain, taking advantage of the naphtha's nonconformance to escape from the price set in the original contract. Again, SGS may not be held liable for the buyer's aggressive business practices in a deal between experienced international traders in petroleum products. It was the fact of the cargo's nonconformance that gave Sun Oil the opportunity to avoid its original commitment.

Another piece of evidence that supports the conclusion that Vitol failed to prove causation is that when it and Sun Oil renegotiated the contract, they used the MS results instead of the binding but dubious GC results at issue here. Even Vitol's first witness, its employee Goughary, conceded that the new contract was negotiated using the MS test results. As the GC tests were only binding under the original contracts, the parties were free to use any information at their disposal when they renegotiated. It is hardly surprising that they chose the more accurate MS test. We conclude therefore that there is no causal nexus between the renegotiated contract price and the GC tests.

As a consequence, the lost profits Vitol suffered when it renegotiated the contract with Sun Oil were not proved to be the direct and proximate result of the breach by SGS of its contract to test the cargo's contents. Absent such proof of causation, there can be no recovery for special damages. *See Kenford Co., Inc. v. County of Erie,* 108 A.D.2d 132, 135, 489 N.Y.S.2d 939 (4th Dep't.1985).

■ Vitol is, nonetheless, entitled to direct damages. Vitol paid to have a test performed with a reasonable degree of accuracy. The district court found that SGS did not use that degree of care in testing that a reasonably prudent tester would have exercised under the circumstances. Hence, Vitol should have returned to it the $220 fee it paid to have the test performed.

### B.

Because the district court awarded Vitol damages amounting to the difference between the price it received for the naphtha and the price it would have received had SGS conducted an accurate test—special damages—it is necessary to comment briefly on this misapplication of the law of damages. The venerable case of *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng.Rep. 145 (1854), states the controlling rule for recovery of lost profits in New York. *See Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 316–17, 540 N.Y.S.2d 1, 2, 537 N.E.2d 176, 177 (1989). There are two portions of the rule: the first is causation, and the second is notice of special circumstances. *See Primrose v. Western Union Telegraph Co.,* 154 U.S. 1, 29–31, 14 S.Ct. 1098, 1106–07, 38 L.Ed. 883 (1894).

We have already considered causation and determined that Vitol's losses did not flow in the natural course of things from the failure of SGS to test in a workmanlike

manner. Yet even had the cargo contained the requisite percentages of N & A, and Vitol and Sun had renegotiated their contracts on account of SGS' report, Vitol still would not have been entitled to the lost profits awarded by the district court. In other words, even if Vitol had proved causation, there was no evidence presented that the second portion of the rule—notice of special circumstances—existed in this case.

This issue of notice has plagued courts on both sides of the Atlantic for centuries. For example, in *Hadley v. Baxendale,* Baron Alderson wrote that liability for breach of contract is limited to "such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract...." 9 Ex. at 354, 156 Eng.Rep. at 151. This old English case is generally credited with originating this lost profits damages principle. The rule is actually much older. It was first stated 50 years earlier in the *Code Civil des Français,* commonly known as the *Code Napoleon* (Paris 1804 & photo. reprint 1960), Article 1150 of which states that the debtor "is only bound for damages and interest which were foreseen, or which might have been foreseen at the time of the contract...." The civil law provided that only those losses which a party may be assumed to have foreseen are recoverable as damages. 1 M. Pothier, *The Law of Obligations* 91 (London 1806). Other kinds of losses, foreign to the contract, are not recoverable even though they arise from the same non-performance because those losses were not contemplated when the contract was entered into, and it cannot be assumed that the performer intended at the time of the contract to obligate itself for such an unforeseen risk. *See id.* These concepts were repeated in the writings of Chancellor James Kent, one of New York's earliest legal luminaries. 2 J. Kent, *Commentaries on American Law* 485 (5th ed. 1844).

The above recited rules of causation and notice state the New York law on special damages. *See Masterton & Smith v. Mayor of Brooklyn,* 7 Hill 61, 68 (N.Y.Sup.Ct. 1845); *Griffin v. Colver,* 16 N.Y. 489, 493 (1858) (failure to deliver a steam engine on time did not give rise to claim for lost profits because such loss not within contemplation of parties at time they contracted); *Chapman v. Fargo,* 223 N.Y. 32, 36–37, 119 N.E. 76 (1918). Consequently, Vitol had the burden of proof to show that SGS had notice of the special circumstances involved in Sun Oil's rejection of the GC test results and the consequences for Vitol of price renegotiation. Vitol was also required to prove that, with knowledge of these circumstances, SGS nonetheless assumed such risk. *See Carlson Constr. Co. v. New York Tel. Co.,* 45 Misc.2d 229, 233, 256 N.Y.S.2d 49 (1964); *Kenford,* 108 A.D.2d at 138, 489 N.Y.S.2d 939. It failed to sustain that burden.

▉ The conclusion that SGS had no notice of potential special damages—and would be surprised to find it had assumed the risk of being liable for them—is further strengthened by comparison of Vitol's asserted damages to the fee SGS charged for the GC test: $547,688 to $220, a ratio of approximately 2,000 to one. This enormous disparity between the fee SGS charged Vitol and the damage liability SGS allegedly assumed is persuasive evidence that assumption of that risk was not within SGS's contemplation at the time it agreed to perform the testing. *See Restatement (Second) of Contracts* § 351 comment f ("The fact that price [charged] is relatively small suggests that it was not intended to cover the risk of such liability."). If, as a rational economic actor, SGS intended to assume that risk, plainly it would have charged substantially more for its testing services. Or, it might have turned down Vitol's request altogether rather than risking so large a liability for a pittance. Further, *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275, *supra,* does not dictate a contrary result, as my respected colleague Judge Pratt believes. The independent weighers in *Glanzer* had significantly more advance notice of the consequences of their negligence than did SGS. There the contract price was not an indirect or consequential action of the weighing, rather, the contract price was a direct function of the pounds of beans sold. *Id.* at 238, 135 N.E.

275. Hence, by inaccurately weighing the beans the *Glanzer* defendants did not merely "affect the contract price," but actually established the price that plaintiffs paid. SGS, in contrast, was only asked to measure the N & A content in the oil shipment to determine if the naphtha conformed or not—a zero-sum analysis. Thus, SGS had absolutely no notice that if it erred in its determination of the *magnitude* of non-conformance that it would be held liable for over one-half million dollars in damages. In short, SGS's action affected the contract price indirectly and collaterally, not directly and with special notice as in *Glanzer.*

## III  CONCLUSION

The judgment appealed from therefore is reversed and the case remanded to the district court for it to enter judgment for direct damages in the amount of $220. As we find that Vitol was not entitled to special damages, its crossappeal respecting the amount of special damages awarded it is moot.

Reversed and remanded.

FEINBERG, Circuit Judge
(concurring):

I concur in the result and join Judge Cardamone's opinion, except for Part II–B as to which I express no opinion. I decline to enter into the discussion between my colleagues about *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922) and whether or not there was notice in this case. In my view of diversity cases, the federal court should say no more than it has to about state law, and I agree with Judge Pratt that Part II–B of the opinion is "unnecessary."

GEORGE C. PRATT, Circuit Judge,
concurring:

I concur in the result and readily join in Judge Cardamone's fine discussion in part II–A of the opinion. Special damages are inappropriate here because Vitol's loss "flowed not from anything defendant did or did not do", but instead from plaintiff's "tender of nonconforming cargo".

However, I am unable to join in part II–B of the discussion insofar as it opines that, even if SGS's conduct had caused Vitol's injury, Vitol would still not be entitled to special damages. In my view, that section is dictum, not only unnecessary to the decision, but also too narrow in its interpretation of New York law.

In New York's leading case, *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922) (Cardozo, J.), independent weighers were held liable for special damages when they negligently mismeasured a quantity of beans in transit from seller to buyer. Noting that the weighers had been aware of the contract between buyer and seller, had sent their measurement results to both parties, and had recognized that these results could affect the contract price, the court held that reliance by the buyer and seller on the weight results "was not an indirect or collateral consequence of the action of the weighers"; but rather, "was a consequence which, to the weighers' knowledge, was the end and aim of the transaction." *Id.* at 238–39, 135 N.E. at 275. In such circumstances, the court held, special damages are appropriate. *Id.; Credit Alliance v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985) (awarding special damages to plaintiff, who relied on the results of a faulty audit report, because the defendant-auditor transmitted the results of its audit directly to plaintiff, because it knew that plaintiff "would be relying on the audit reports", because defendant was in "direct communication" with plaintiff about the results, and because defendant knew the "end and aim" of the audit was to aid plaintiff in making a financial determination).

Here, as in *Glanzer* and *Credit Alliance,* SGS was aware of the contract between Vitol and Sun, it transmitted the results of its tests to both parties, and it recognized that these results would determine whether the naphtha was conforming. Under such circumstances, Vitol's reliance on the test results was a consequence which, to SGS's knowledge, "was the end and aim of the transaction"; therefore, if SGS's conduct had caused Vitol's injury, Vitol could col-

lect special damages under New York law. *Glanzer*, 233 N.Y. at 239–42, 135 N.E. at 276–77; *Credit Alliance*, 65 N.Y.2d at 554, 483 N.E.2d at 121, 493 N.Y.S.2d at 445.