SUNDANCE CRUISES CORPORATION, SCI Cruises, Inc., also known as Sundance Cruises, Inc., Plaintiffs–Appellants,

v.

The **AMERICAN BUREAU OF SHIPPING**, Defendant–Appellee.

No. 1141, Docket 92–9153.

United States Court of Appeals, Second Circuit.

Argued March 10, 1993.

Decided Oct. 15, 1993.

Brian D. Starer, New York City (Haight, Gardner, Poor & Havens, of counsel), for plaintiffs-appellants.

John J. Loflin, New York City (Lord Day & Lord, Barrett Smith, of counsel), for defendant-appellee.

Before: TIMBERS, KEARSE, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

On June 29, 1984, the luxury cruise ship SUNDANCER struck an underwater rock off the coast of British Columbia and sank. The ripples caused by the sinking spread beyond the Pacific waters of Discovery Passage to the United States District Court for the Southern District of New York, where the owners of the SUNDANCER, Sundance Cruises Corp. ("SCC") and Sundance Cruises, Inc. ("SCI") (collectively, "Sundance"), filed suit against the American Bureau of Shipping ("ABS"), a classification society headquartered in New York. A classification society such as ABS develops rules, guides, standards, and other criteria for the design and construction of ships. When requested, a society reviews the design and surveys a ship before, during, and after construction to verify compliance with the relevant international safety conventions and applicable rules of the classification society.

Less than two weeks before the SUNDANCER foundered, ABS had issued certificates to Sundance representing that the vessel complied with international safety standards and with ABS's own rules for classifying vessels. Sundance raised claims in contract and tort, alleging that in carrying out its contractual duties of inspecting the vessel

and issuing safety and classification certificates, ABS had failed to detect and advise Sundance that the watertight integrity required of the vessel was compromised by holes in one of its bulkheads and by the absence of valves in its sanitary or "grey-water" piping system.

ABS raised numerous defenses to liability, including a claim that Bahamian law, the law of the vessel's flag, immunized ABS from any liability arising from safety inspections it performed for the Bahamian government. In a thorough opinion, the district court, Whitman Knapp, *Judge,* agreed; on motion for reargument, the court held that in addition, Sundance had provided no evidence that it was damaged by ABS's purported errors in issuing the classification certificate, and granted ABS's motion for summary judgment. 799 F.Supp. 363 (S.D.N.Y.1992). Sundance now appeals from final judgments of the district court entered on July 31 and September 21, 1992, which dismissed its complaint with prejudice.

## FACTS AND BACKGROUND

We recount only the facts necessary to this appeal; a more detailed recitation of facts may be found in the district court's opinion at 799 F.Supp. 363.

In early 1984 Sundance purchased an overnight car ferry and converted it at a Swedish shipyard into a luxury cruise ship capable of making week-long voyages along the west coast of North America, with accommodations for over seven hundred passengers. Sundance sought to register the converted vessel with the Bahamian government; the Bahamian Merchant Shipping Act requires that Bahamian flag ships evidence their compliance with several international safety conventions to which the Bahamas adheres. Accordingly, Sundance needed (1) a safety certificate representing the ship's compliance with the 1974 Convention on the Safety of Life at Sea ("SOLAS"); (2) a certificate showing compliance with the Load Line Convention; and (3) a Tonnage certificate, not at issue in this case. These certificates are referred to herein variously as the "statutory" or "safety" certificates. In addition, in order to obtain insurance for the vessel, Sun-

dance also needed a classification certificate, a document that certified the vessel's compliance with the classification society's own rules. 799 F.Supp. at 369.

On March 5, 1984, Sundance formally retained ABS by executing, in Sweden, an agreement denoted "Request for Classification Survey and Agreement". By that agreement, ABS was engaged to inspect the vessel to determine its compliance with ABS class rules and to perform regulatory checks on behalf of the Bahamian government in connection with the issuance of the above mentioned statutory and class certificates. Classification of a vessel by ABS represents that the ship has been found structurally and mechanically fit for a particular use or service in accordance with ABS rules and standards.

ABS representatives were on site during some portions of the conversion process in the Swedish shipyard. Sundance provided ABS with many plans for the vessel, although for some reason no plans for the grey-water piping system, which channels water from the ship's showers and sinks, were ever provided. 799 F.Supp. at 369. Inspections of the converted ship took place in Sweden and on board the vessel during its initial voyages. *Id.*

On June 14, 1984, acting on behalf of the Bahamian government, ABS issued a five-month provisional Load Line certificate and a SOLAS passenger ship safety certificate to the vessel. The SOLAS certificate represented, among other things, that the vessel possessed the water-tight integrity required by the SOLAS Convention. Shortly thereafter, ABS issued a provisional classification certificate to the vessel, which represented that the vessel was in compliance with ABS's rules, including rules on the watertight integrity of vessels.

The SUNDANCER was a two-compartment ship, meaning that it could survive the flooding of any two of the watertight compartments of its thirteen. When the SUNDANCER struck the underwater rock, its hull was breached below the waterline. While only two watertight compartments initially flooded, progressive flooding of other

compartments occurred when water passed through two holes in bulkhead 124 and through the unvalved grey-water system. As a result of the progressive flooding, the vessel listed heavily and eventually sank at a nearby pier.

The absence of valves in the grey-water system was a SOLAS violation; the two holes in bulkhead 124 were a violation of both SOLAS and ABS's rules. Neither violation had been reported by ABS. The SUN-DANCER was declared a constructive total loss, and some passengers and crew members were injured. Fortunately, no lives were lost.

Sundance claims that the vessel would not have sunk but for ABS's (1) negligence, (2) gross negligence, (3) negligent misrepresentation, (4) breach of contract, and (5) breach of the *Ryan* implied warranty of workmanlike performance in issuing the relevant certificates, *see Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). ABS was paid a fee of $85,000 under the contract. Sundance seeks actual and punitive damages totalling $264,000,000.

The district court held that the law of the vessel's flag, Bahamian law, shielded ABS with immunity for its actions in issuing the SOLAS and Load Line certificates for the Bahamian government. Irrespective of immunity, the court concluded that Sundance had not produced any evidence to sustain a charge of gross negligence, and that Sundance's negligent misrepresentation claim failed for lack of "a scintilla of evidence * * * that plaintiff had asked defendant to provide it with any information for its guidance". 799 F.Supp. at 382. Finally, the court held that no *Ryan* implied warranty existed in a ship-inspection setting. 799 F.Supp. at 385–86.

In contrast, the court denied ABS's motion for summary judgment on Sundance's breach of contract claim, and denied the motion in part concerning Sundance's assertions of ABS's negligence. Regarding the negligence claim, the court held that the Supreme Court's decision in *East River S.S. Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), barred Sundance's recovery in tort of damages for

harm to the ship, but did not bar those damages Sundance sought to indemnify it for paying personal injury claims arising from the incident. The court held that significant issues of material fact would remain for these claims, requiring further exploration, were ABS not immunized for its conduct. On motion for reargument, the district court clarified its earlier holding: although ABS had no immunity for issuing the classification certificate, Sundance had provided no evidence that it was "in any way damaged by possible errors in issuing that particular certificate." *Id.* at 393.

This appeal requires us to review, in turn, the district court's determinations that (1) Bahamian law applies here, (2) the Bahamian immunity statute shields ABS from liability for certificates issued on behalf of the Bahamian government, and (3) Sundance presented no evidence of damages flowing from ABS's issuance of the classification certificate.

## ANALYSIS

We review the grant of a motion for summary judgment *de novo*, construing all facts in favor of Sundance, the nonmoving party. Summary judgment is proper when the moving party establishes an absence of genuine issues of material fact. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### A. *Applicable Law.*

■ Federal maritime law, including federal maritime choice-of-law rules, applies to maritime contracts. *Kossick v. United Fruit Co.,* 365 U.S. 731, 735, 81 S.Ct. 886, 889, 6 L.Ed.2d 56 (1961). A contract may acquire a maritime quality when the "the matters performed or entered upon under it pertain to the fitment of [the] vessel for navigation". *Cox v. Murray,* 6 F.Cas. 681, 682 (S.D.N.Y. 1848). A maritime contract is one that " 'relat[es] to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment.' " *CTI–Container Leasing Corp. v. Oceanic Operations Corp.,* 682 F.2d 377, 379 (2d Cir.1982) (quoting 1 E.

Benedict, *Benedict on Admiralty* § 183, at 11–6 (7th ed. 1981)).

A contract to inspect a ship for its compliance with international safety rules and the rules of a vessel classification society is maritime in nature. Contracts for vessel certification and classification are unique to the realm of admiralty; these inspections and resulting certificates are required either legally or practically before a shipowner may ply navigable waters. 799 F.Supp. at 369.

Sundance's claims, therefore, fall under maritime law and are subject to federal maritime choice-of-law rules.

### 1. Choice-of-Law Clause.

The parties' original agreement was silent as to the applicable law. 799 F.Supp. at 367. Sundance contended, however, that the parties intended New York law to govern the agreement. In support of this argument, Sundance relied on the choice-of-law clause preprinted on the back of seven invoices that ABS had sent to Sundance after the original agreement was signed. The clause, entitled "GOVERNING LAW", provides in relevant part that: "The validity, interpretation and performance hereof shall be governed by the laws of the State of New York." *Id.* The initials of a Sundance representative appear on approval stamps which Sundance glued to the reverse side of the invoices in such a way as to obliterate the law-selection clause. *Id.*

The district court agreed with ABS that by paying these invoices, Sundance did not mutually agree in writing to vary the terms and conditions of the original agreement, which was silent as to the applicable law. The court held that, accordingly, general principles of admiralty law govern the contract. We agree.

This is an unusual case in that Sundance, the party who examined and returned these post-contractual invoices, seeks to be bound by the fine print preprinted on the back of the documents, while ABS, drafter of the invoices, objects.

We think the issue of whether the parties intended to effectuate the choice-of-law provision in the ABS invoices is a closer question than did the district court. However, we think that the question does not ultimately turn on the parties' intent, because federal maritime law governs this case, whether by direct application of admiralty rules or by way of New York law, which also requires application of federal maritime law to maritime cases. *See, e.g., Hess v. United States,* 361 U.S. 314, 318, 80 S.Ct. 341, 345, 4 L.Ed.2d 305 (1960) (state must look to maritime law to resolve claim for wrongful death which occurred on navigable waters); *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959) (if maritime action had been brought in state court, "reference to admiralty law would have been necessary to determine the rights and liabilities of the parties"); *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 409, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953) (federal maritime law controls any claim rooted in admiralty); *Allied Chemical Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro,* 775 F.2d 476 (2d Cir.1985) (suit involving claims by shipper against ocean carrier for breach of contract was within the court's admiralty jurisdiction and was governed by federal maritime law); *Lerner v. Karageorgis Lines, Inc.,* 66 N.Y.2d 479, 497 N.Y.S.2d 894, 895, 488 N.E.2d 824, 825 (1985) (state courts in maritime cases must apply federal law to secure single and uniform body of maritime law).

Nor could it be argued that the parties in this case intended to reference non-maritime New York law. *Cf. CTI–Container Leasing Corp.,* 682 F.2d at 382 n. 8 (declining to decide whether private contractual choice-of-law clauses are effective in admiralty); *Stoot v. Fluor Drilling Servs., Inc.,* 851 F.2d 1514, 1517 (5th Cir.1988) (contractual choice-of-law clause effective unless chosen law has no substantial relationship to parties or transaction, or chosen state law conflicts with fundamental purposes of maritime law).

### 2. Lauritzen Choice Factors.

Federal maritime choice-of-law principles are derived largely from the Supreme Court's decision in *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), and its progeny. *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d

252 (1970); *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Although *Lauritzen* involved the Jones Act, the Court has held that "[t]he broad principles of choice of law and the applicable criteria of selection set forth in *Lauritzen* were intended to guide courts in the application of maritime law generally." *Romero*, 358 U.S. at 382, 79 S.Ct. at 485. *Lauritzen* directs our attention to several relevant choice considerations: (1) the place of the wrongful act, (2) the law of the ship's flag, (3) the domicile of the injured party, (4) the domicile of the shipowner, (5) the place of contract, (6) the inaccessibility of the foreign forum, and (7) the law of the forum. 345 U.S. at 583–92, 73 S.Ct. at 928. The Court in *Lauritzen* emphasized the importance of the law of the flag, which "overbears most other connecting events in determining applicable law". *Lauritzen*, 345 U.S. at 585, 73 S.Ct. at 930.

After thoroughly examining the multitude of international contacts in this case, the district court found that the most significant contacts pointed to the application of Bahamian law:

> [F]actors other than the flag * * * point indiscriminately to much of the globe, land and sea, between Sweden and Canada. The wrongful acts alleged to be chargeable to defendant are claimed to have taken place in Sweden, New York, London, Miami, Mexico, California, and on the high seas. Plaintiff, the injured party, is a Panam[an]ian corporation owned by Swedish, Finnish, and United States interests. The vessel was managed by a Swedish company, while its home berth at the time of the casualty was in Canada, and its base of operations with respect to marketing and administration was in the State of Washington. The defendant is a New York corporation based in New York City with offices throughout the world. The bulk of defendant's contacts with plaintiff occurred in its offices in Sweden, London, and New York. The place of contract was Sweden * * *. Defendant received the contract in New York after it had been signed. No one contends that any foreign forum would be inaccessible. The law of our forum would be that of New York, [al]though

* * * New York courts would apply federal maritime law.

799 F.Supp. at 387.

The district court ultimately held that law of the flag, Bahamian law, governs this dispute. *Id.* Judge Knapp determined "this factor to be the most compelling because of the flag state's clear and powerful interest in the actions that are at the heart of this case". *Id.* We agree. The SOLAS and Load Line certificates were necessary for Sundance to register the ship in the Bahamas, and Sundance had freely chosen the Bahamian flag for the SUNDANCER for its own reasons of convenience.

The Supreme Court has expressed concern over assertions of flag law when shipowners appear to have selected "sham" flag countries in order to avoid the more stringent requirements of other countries. *See Lauritzen*, 345 U.S. at 587, 73 S.Ct. at 930. Significantly, however, this concern is not present here, as it is Sundance, the shipowner, who seeks to avoid application of the law of the flag and thereby undo the consequence of its own choice of flag. Application of the law of the flag here benefits the classification societies selected by the Bahamian government to perform safety inspections and not shipowners such as Sundance.

**B.** *Bahamian Immunity Statute.*

Bahamian law confers immunity upon its agents:

> Every officer appointed under this Act, and every person appointed or authorized under this Act for any purpose of this Act, shall have immunity from suit in respect of anything done by him in good faith or admitted to be done in good faith in the exercise or performance, or in the purported exercise or performance, of any power, authority or duty conferred or imposed on him under this Act.

Bahamian Merchant Shipping Act of 1976 § 279 (the "Act").

ABS was nominated under Bahamian regulations pursuant to the Act as one of six classification societies authorized to perform surveys on behalf of the Bahamian govern-

ment. Regulation 3 of the Merchant Shipping Regulations 1976. In our case, the Bahamian Deputy Director of Maritime Affairs wrote ABS especially to confirm his understanding that ABS was to undertake SOLAS and Load Line surveys of the SUNDANCER on behalf of the Bahamian government.

Section 3 of the Interpretation and General Clauses Act of the Bahamas defines "person" to include "any public body and any body of persons, corporate or unincorporate", "unless the context otherwise requires".

The district court, "not without reservations", rejected ABS's contention that classification societies were "persons" entitled to immunity as defined in § 279, holding that the context required a definition that excluded corporations like ABS from the protection of § 279. First, the court looked to the provision of the Merchant Shipping Act which sets forth the manner in which the Bahamas empowers surveyors to act on its behalf:

> (1) The Minister may *appoint*, in any port or place within or without The Bahamas, duly qualified persons to be surveyors to survey and measure ships under and for the purposes of this Act.
>
> (2) The Minister may, by regulations, *nominate* any corporation or society within or without The Bahamas to be a Classification Society for the purposes of this Act, and any Classification Society may *authorize* any person to survey and measure ships under and for the purpose of this Act.

Bahamian Merchant Shipping Act of 1976 § 66 (emphasis added).

The court held that the different verbs used in § 66, "appoint", "nominate", and "authorize", limited the scope of immunity in § 279. The district court reasoned that the Bahamian Parliament would have used the term "nominated" in § 279, just as it did in § 66, had it intended to refer to a classification society. The court held that from the absence of the word "nominate" in § 279, one could infer that ABS did not enjoy immunity. In other words, the court held that ABS was not an "officer" or "person" "appointed or authorized", and thus was not entitled to § 279 immunity. 799 F.Supp. at 389. Fur-

ther, the court held that had the Bahamian Parliament used the term "person" as broadly as defined in the Interpretation and General Clauses Act, there would have been no need to distinguish between a "person" and an "officer", because the former term would include the latter. *Id.*

We disagree. Section 3 instructs that "person" includes a corporation unless the context requires otherwise. Section 66 exists merely to inform us that the Bahamian Minister of Shipping may appoint his own surveyors, and to nominate classification societies to perform a similar function. This "context" in no way compels the conclusion that the Bahamian Parliament intended to exclude classification societies from the laws immunizing its agents. As § 66 itself makes clear, classification societies are no less agents of the Bahamian government than are individual surveyors who carry out the same task. Furthermore, it would be highly unusual for the Bahamian government to immunize individual ABS surveyors but not their principal whom the Bahamas specifically nominated to act on its behalf. ABS, a corporate entity, of course must act through the acts of its individual employees.

In sum, we agree with the district court that § 279 immunizes ABS for its actions performed for the Bahamian government, albeit for a different reason than the district court. 799 F.Supp. at 390–91.

### C. *Liability for Issuance of Classification Certificate.*

■ The Bahamian immunity statute does not immunize everything that a classification society may do in the course of its business. Section 279 provides immunity for "anything done * * * in good faith * * * in the exercise or performance * * * of any power, authority or duty conferred or imposed on him under [the Merchant Shipping Act]".

In the present context that immunity extends to the statutorily required SOLAS and Load Line certificates, but does not cover ABS in its issuance of the classification certificate, a document needed for purely private purposes. Because there is no statutory immunity for the classification certificate,

this case presents us squarely with the question of whether a classification society that issues a classification certificate is liable to the person who hires it for all of the consequences of defects not found by the certifier. Had the defects been found, the vessel would not have been classified until the defects were corrected.

Judge Knapp stated the resolution to this problem concisely by pointing out that Sundance had failed to show any damage flowing from issuance of the classification certificate. 799 F.Supp. at 393. He held that Sundance presented no evidence that it was "in any way damaged by possible errors in issuing that particular certificate". *Id.*

We think this result is sound, and it reflects our view that a shipowner is not entitled to rely on a classification certificate as a guarantee to the owner that the vessel is soundly constructed. First, the great disparity between the fee charged ($85,000) by ABS for its services and the damages sought by Sundance ($264,000,000) is strong evidence that such a result was not intended by the parties. We can only conclude that the small fees charged could not have been intended to cover the risk of such liability; the ship classification industry could not continue to exist under such terms. *See, e.g., Vitol Trading S.A., Inc. v. SGS Control Servs., Inc.,* 874 F.2d 76, 81–82 (2d Cir.1989) (quoting Restatement (Second) of Contracts § 351 cmt. f: "fact that price [charged] is relatively small suggests that it was not intended to cover the risk of such liability" ).

Second, and probably most significantly, the shipowner, not ABS, is ultimately responsible for and in control of the activities aboard ship. In the case of the SUNDANCER, for example, Sundance had full responsibility for the conversion, repairs, and maintenance of the vessel. This ongoing responsibility for the vessel is supplemented by the maritime-law requirement that the shipowner has a nondelegable duty to furnish a seaworthy vessel. *Great American Ins. Co. v. Bureau Veritas,* 338 F.Supp. 999 (S.D.N.Y. 1972), *aff'd,* 478 F.2d 235 (2d Cir.1973). ABS can not be said to have taken over Sundance's obligations in this regard by agreeing to inspect and issue a classification certificate to Sundance.

This case must be distinguished from a suit brought by an injured third party who relied on the classification or safety certificates. *See, e.g., Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922); *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931). In those cases, the New York Court of Appeals approved claims by third-party purchasers who had foreseeably relied on certificates issued by defendants at the behest of the sellers. In *Glanzer,* for example, the Court permitted a purchaser of a volume of beans to sue and recover against the bean seller's selected weigher. In contrast, here, Sundance is not in the role of a short-changed purchaser; it more resembles the bean seller—responsible for the bean shortfall and under a duty to remedy it. Sundance cannot recover for the shortfall it created by suing the bean weigher for inaccurately representing that the correct amount was shipped. In *Ultramares,* a foreseeable third party sued an accountant for providing inaccurate information about a company's financial health. *Id.* Here, Sundance is in the position not of an injured third party, but of the financially ailing party who hired the inaccurate accountant.

We agree with the district court that Sundance's posture in this lawsuit is somewhat similar to one who causes a vehicle accident and then sues the Motor Vehicle Bureau for damages to his car because it issued him a driver's license that falsely represented his fitness to drive. Or, another example, Sundance may be here likened to a truck owner seeking recovery from a truck inspection service because it issued a safety certificate shortly before the truck's negligently maintained brakes failed.

Put simply, the purpose of the classification certificate is not to guarantee safety, but merely to permit Sundance to take advantage of the insurance rates available to a classed vessel. See generally Judge Tyler's thoughtful discussion of the liability of a classification society in *Great American Ins.,* 338 F.Supp. at 1009–13.

Because the "no damage" rationale is sufficient to dispose of the tort and contract

claims relating to the non-immunized classification certificate, it is unnecessary for us to consider the district court's alternate grounds for granting summary judgment in favor of ABS.

## CONCLUSION

We affirm the district court's dismissal of all of Sundance's tort and contract claims against ABS. Bahamian law immunizes ABS—not as a matter of respondeat superior, *see* 799 F.Supp. at 389–91, but directly—for its good-faith conduct in issuing the statutory safety certificates. In addition, Sundance did not provide any evidence that it suffered damage from ABS's issuance of the classification certificate; Sundance may not create a condition of unseaworthiness, exercise all control over the reconstruction and servicing of the vessel and then burden a classification society with liability that is seven hundred times that of the fee for the classification contract.

Affirmed.