**CARBOTRADE SpA, on its own behalf and as an assignee of Essex Cement Co., Plaintiff,**

v.

**BUREAU VERITAS, Defendant.**

**BUREAU VERITAS, Third–Party Plaintiff,**

v.

**TITAN CEMENT COMPANY, S.A., Third–Party Defendant.**

**No. 92 Civ. 1459 (JGK).**

United States District Court, S.D. New York.

Oct. 19, 1995.

Thomas L. Tisdale, Patrick Lennon, Law Office of Thomas L. Tisdale, New York City, for Plaintiff.

Christopher B. Kende, Bradley F. Gandrup, Jr., John E. Grimmer, Holzmann, Wise

& Shepard, New York City, for Defendant and Third–Party Plaintiff.

## OPINION AND ORDER

KOELTL, District Judge.

This admiralty action arises from the loss of cargo that occurred when the vessel M/V "STAR OF ALEXANDRIA" ("STAR OF ALEXANDRIA" or the "vessel") sank during its April 1989 voyage across the Atlantic. The plaintiff Carbotrade SpA ("Carbotrade"), who had chartered the vessel from her owners, brings this action on its own behalf and as an assignee of Essex Cement Co. ("Essex"), the subcharterer of the vessel and owner of her cargo, seeking damages for the cargo lost as a result of the sinking. The plaintiff alleges that the defendant and third-party plaintiff Bureau Veritas ("B.V."), a classification society, is liable for this loss because B.V. negligently endorsed the vessel's certificate of classification. The plaintiff contends that B.V. failed to detect or failed to act upon perceivable defects in the vessel, and that this failure was the proximate cause of the vessel's sinking. B.V. now moves for summary judgment pursuant to Fed.R.Civ.P. 56(c) on the basis that it owed no legal duty to the plaintiff, and that even if B.V. did have such a duty, the plaintiff neither actually nor reasonably relied on B.V.'s classification of the vessel. For the reasons explained below, the defendant's motion is granted.

## I.

The STAR OF ALEXANDRIA was a British flag bulk carrier registered in the United Kingdom ("U.K.") dependency of Gibraltar. Kende Aff., Exh. 13 (Certificate of British Registry). The vessel broke in two amidships and sank on April 17, 1989 in international waters while on a voyage from Eleusius, Greece, to Newark, New Jersey. Its owner was Caribene Investments, Ltd. ("Caribene"), a corporation organized under the laws of Gibraltar. *Id.;* Exh. 2 (Tisdale 5/26/92 Aff.) at ¶ 6. Pursuant to a charter dated February 28, 1989 ("head charter"), Caribene chartered the STAR OF ALEXANDRIA to the plaintiff Carbotrade, an Italian corporation with its principal place of business in Italy. Tisdale Aff., Exh. 10 ("head charter"); Kende Aff., Exh. 1 (First Amended Complaint) at ¶ 2. On the same day, Carbotrade subchartered the vessel to Essex, a New Jersey partnership and affiliate of the third-party defendant Titan Cement Company ("Titan"), a Greek corporation and owner of the cement cargo aboard the STAR OF ALEXANDRIA when it sank. Tisdale Aff., Exh. 7 (voyage subcharter); Tisdale Aff., Exh. 1 (Tsanglis Dep.); Kende Aff., Exh. 22 (Essex–Titan Term Cement Supply Agreement); Kende Aff., Exh. 25 (Bill of Lading). Essex is not a party to this action. Carbotrade's insurer, The Standard of London, has settled with Essex for $1.25 million and currently owns Essex's claim to causes of action to recover damages for the lost cargo. Kende Aff., Exh. 38A (Ravano Dep.). Essex is to receive a portion of any recovery Carbotrade obtains from any third-party actions connected to the sinking of the STAR OF ALEXANDRIA. Kende Aff., Exh. 29 (settlement, release, and assignment agreement between Carbotrade and Essex).

In this action, Carbotrade sues the classification society Bureau Veritas ("B.V."), a French corporation with its principal place of business in France and offices in ports throughout the world, including New York. Kende Aff., Exh. 6 (Godefroi Decl.) at ¶¶ 2, 4. B.V. promulgates standards for the quality and integrity of ocean-going vessels to determine their conformity with B.V.'s published standards by "classing" vessels in accordance with its rules. *Id.* at ¶ 3. All of B.V.'s agreements to class a vessel are entered into with the vessel's owner and are approved by personnel in B.V.'s headquarters in Courbevoie, France. *Id.* at ¶ 4. B.V. classes vessels for terms of three to five years, depending upon the vessel's age. Tisdale Aff., Exh. 18 (B.V.'s "Rules and Regulations for the Classification of Steel Ships 1988"), Art. 2–12.1. During the term, B.V. conducts surveys "for the maintenance, renewal or confirmation of their class." *Id.*, Art. 2–11.1. After a survey, the B.V. surveyor issues a classification certificate or endorses the classification certificate with a visa reflecting the survey. *Id.*, Art. 2–11.1. The certificate and visas represent "the only authentic information about the class of the ship; they may be made

available by the Owner to all interested parties." *Id.*, Art. 2–11.1. In addition, a ship's classification is valid only if the vessel is "loaded and operated in a proper manner by competent and qualified crew or operating personnel according to the environmental, loading operating and other criteria on which classification is based." *Id.*, Art. 1–12.2.23. Here, the STAR OF ALEXANDRIA, a Gibraltar-registered vessel, was subject to U.K. manning laws. Kende Aff., Exh. 28 (Holmes Decl.) at ¶¶ 7–11.

Under the head charter, the owner of the STAR OF ALEXANDRIA warranted to the plaintiff that the owner would maintain the vessel in class. Tisdale Aff., Exh. 10. B.V. was not a party to this charter. The charter also provided that Carbotrade's surveyor and master would conduct an on-hire survey "for the purpose of ascertaining the vessel's condition," and that "[b]efore Notice of Readiness is tendered at loading port, the vessel is to be inspected and passed by Charterer's surveyor." *Id.*[1] The charterer had the option of cancelling the charter up to the day of the vessel's readiness. *Id.* If anything prevented "the full working of the vessel," Carbotrade could cease paying the daily hire for the vessel until the situation was corrected. *Id.* In addition, the charter provided that any dispute between Caribene and Carbotrade would be settled through arbitration in London. *Id.*

Unlike the head charter, the subcharter between Carbotrade and Essex contained no express provision that the owner would maintain the vessel's class. *See* Tisdale Aff., Exh. 2 (Fjeldberg Dep.) (noting that subcharter does not mention vessel's classification). The plaintiff contends, however, that one of the clauses of the subcharter, which stated that the ship was "warranted tight, staunch, and strong, and in every way fitted for the voyage," implied a guarantee that the ship would be in class. Tisdale Aff., Exh. 7; Exh. 2 (Fjeldberg Dep.). Like the head charter, the subcharter required that before the Notice of Readiness to load cargo was tendered, the vessel was to be inspected and passed by the

charterer's surveyor. Tisdale Aff., Exh. 7. This surveyor could fail the vessel for inspection if he found repairs were necessary, and if the vessel did not pass inspection within 48 hours of the surveyor's first inspection, the charterers had the option to cancel the charter party. Tisdale Aff., Exh. 7; Kende Aff., Exh. 34 (Fjeldberg Dep.). In addition, the subcharter provided that any disputes between Carbotrade and Essex would be settled through arbitration in New York. Tisdale Aff., Exh. 7.

Beginning in 1985, B.V. conducted various surveys of the STAR OF ALEXANDRIA. Kende Aff., Exh. 10 (classification certificates); Exh. 6 (Godefroi Decl.) at ¶ 8. The last inspection of the ship before it sank took place from March 6, 1989 to March 28, 1989. Kende Aff., Exh. 6 (Godefroi Decl.) at ¶ 8. At this time, B.V. issued two certificates required by international convention: a load-line certificate, which concerns the method of loading cargo, and a safety equipment certificate. *Id.;* Kende Aff., Exh. 10 (classification certificates). In addition, B.V. performed other surveys, including a bottom survey, which is an inspection of the ship's hull in dry dock, and an intermediate survey, which is an internal examination of compartments in the interior of the ship. Kende Aff., Exh. 6 (Godefroi Decl.) at ¶ 9; Kende Aff., Exh. 10 (hull certificate, Visa No. 7); Tisdale Aff., Exh. 11 (Stavropoulos Dep.); Tisdale Aff., Exh. 18, Art. 2–41 (outlining procedures for bottom surveys), Art. 2–44 (intermediate surveys). The plaintiff alleges that B.V. negligently endorsed the ship's classification on the basis of the intermediate and bottom surveys.

An inspection of the ship's hull while in dry dock was not possible in March 1989. In a prior inspection, B.V. had deferred the vessel's dry-docking for the bottom survey until March 1989, and this extension was due to expire on March 20, 1989. Kende Aff., Exh. 10 (hull certificate). However, because a tug strike prevented the STAR OF ALEXANDRIA from proceeding to dry dock, B.V. performed an in-water survey of the vessel's

---

**1.** A Notice of Readiness is a document given by the ship's master to the shippers advising them that the vessel is ready to receive cargo. Kende Aff., Exh. 33 [Eleftheriou Dep.]. This document indicates that "the vessel is in all respects ready to load cargo as per the charter party." *Id.*

bottom instead, and on the basis of this test postponed the full bottom survey once again. Tisdale Aff., Exh. 11 (Stavropoulos Dep.); Kende Aff., Exh. 37 (Osko Dep.); Kende Aff., Exh. 19 (survey report); Tisdale Aff., Exh. 18, Art. 2–14.2.24, 2–41.2 (in-water surveys). The plaintiff alleges that B.V. improperly extended the deadline for dry-docking because it failed to take certain measurements of the propeller shaft and because the inspection was conducted in cloudy water. Tisdale Aff., Exh. 13 (underwater inspection report); Exh. 11 (Stavropoulos Dep.); Exh. 18, Art. 2–41.2.22 (providing that during an in-water survey, "the in-water visibility is to be good"), Art. 2–4.3 (listing specific requirements for in-water surveys).

The plaintiff alleges that the proximate cause of the vessel's sinking was the negligent inspection of the vessel's topside wing tanks during the intermediate survey of the ship. As the B.V. rules for intermediate surveys provide, Mr. Stavropoulos, the B.V. Senior surveyor of the STAR OF ALEXANDRIA, visually inspected and tested all of the vessel's top side wing tanks. Kende Aff., Exh. 19 (survey report); Kende Aff., Exh. 39 (Stavropoulos Dep.); Tisdale Aff, Exh. 18, Art. 2–44.1.11 (an intermediate surveyor must investigate, among other things, "one or several cargo holds, ballast tanks or other compartments, as deemed necessary by the Surveyor"); Tisdale Aff., Exh. 18, Art. 2–44.2.22 (in an intermediate survey, the ballast tanks to be surveyed "should include at least two top wing tanks"). In testing the wing tanks, Stavropoulos noticed some minor leakage. Kende Aff., Exh. 39 (Stavropoulos Dep.). Despite this leakage, Stavropoulos passed the tanks as satisfactory on March 28, 1989, thereby permitting the vessel to remain in class. Tisdale Aff., Exh. 11 (Stavropoulos Dep.); Kende Aff., Exh. 10 (hull certificate, Visa No. 8). The plaintiff alleges that under B.V. rules, there is an implicit understanding that if there is any leakage from these tanks, a vessel will not be certified. *See* Tisdale Aff., Exh. 19 (Pennaneach Dep.). The plaintiff contends that cracks in the wing tanks reduced the vessel's structural strength and thereby contributed to the sinking of the ship. Tisdale Aff., Exh. 32 (Couling Dep.).

During March 1989, an independent surveyor hired by Essex also inspected the vessel. The surveyor, Constantine Tsamados, boarded the ship to conduct this survey four times: March 18, March 21, March 23, and a fourth time between the commencement of the loading and its completion. Kende Aff., Exh. 40 (Tsamados Dep.). Under the terms of the subcharter, the surveyor could fail the vessel for inspection if he found repairs were necessary. Kende Aff., Exh. 34 (Fjeldberg). Like the B.V. surveyor Stavropoulos, Tsamados observed some water leaking from the wing tanks, but noted in his report that they would not be used during the voyage. Kende Aff., Exh. 21 (Tsamados survey report). He certified the vessel as "passed" for carriage of the cement cargo that was ultimately loaded on board. Tisdale Aff., Exh. 26 (Tsamados certificate).

The plaintiff alleges the classification certificate together with the visa from the periodic survey was on board the vessel on March 28, 1995, and that Mr. Tsamados inspected this certificate when surveying the vessel in order to confirm that the certificate had been extended. Tisdale Aff., Exh. 25 (Tsamados Aff.) at ¶ 2; Kende Aff., Exh. 21 (Tsamados survey report) (noting the validity of the classification certificate). The plaintiff concedes, however, that there was never any direct correspondence or communication between the defendant B.V. and Carbotrade or Essex regarding the STAR OF ALEXANDRIA.

In addition, it is undisputed that the Notice of Readiness was issued by the ship's master and accepted by the cargo interests on March 21, 1989, several days before the independent surveyor completed his inspection of the vessel. Kende Aff., Exh. 33 (Eleftheriou Dep.). Loading operations began on March 23, 1989, five days before B.V. renewed the vessel's classification; by March 28, 32,000 of the 33,389 tons of cargo had been loaded onto the vessel. Kende Aff., Exh. 33 (Eleftheriou Dep.); Exh. 25 (Bill of Lading).

The vessel never reached its final destination and sank on April 17, 1989 in international waters. The crew members were rescued by the U.S. Coast Guard and were

brought to Boston, Massachusetts. Kende Aff., Exh. 26 (B.V.'s casualty report). The United Kingdom Department of Transportation ("DOT") investigated the sinking and concluded that it was caused by the negligence of the owners and crew, improper loading of the cargo, and exceptionally stormy weather conditions. Tisdale Aff., Exh. 9 (DOT report). B.V. representatives from Britain, France, and Greece cooperated with this investigation, but no representatives from the United States were involved. Kende Aff., Exh. 6 (Godefroi Decl.) at ¶ 12.

Pursuant to the arbitration clause contained in the head charter, Carbotrade commenced arbitration against Caribene in London and obtained a default judgment against the shipowner. Kende Aff., Exh. 2 (Tisdale 6/26/95 Aff.) at ¶ 18. This judgment has not been satisfied. *Id.* at ¶ 19. Caribene's insurers refuse to satisfy the judgment because the owners allegedly violated manning requirements of Gibraltar, the flag state. *Id.* Thus, Caribene has no known assets, and there is no insurance to compensate Carbotrade on its claims.

In this action, Carbotrade alleges that B.V. is liable for the cargo loss because B.V. breached its duty to Carbotrade by negligently allowing the vessel to remain in class even though it was not seaworthy. Carbotrade claims that B.V. improperly inspected the vessel's wing tanks, and that Carbotrade relied on B.V.'s representation that the vessel was fit and suitable to carry the cargo. Carbotrade alleges that had B.V. refused to extend the hull certificate on March 28, 1989, then neither Carbotrade nor Essex would have allowed the vessel to sail with the cargo aboard. In response, B.V. contends that as a matter of law it owed no duty to the plaintiff, and that even if it did have such a duty, the plaintiff has failed to prove that it actually and reasonably relied on B.V.'s representations that the vessel was in class.

## II.

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *see also Gallo,* 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

## III.

■ As a threshold matter, the Court must determine which law governs this case. The defendant asserts that British law applies, while the plaintiff alleges that the controlling law is either the federal maritime common law of the United States or, in the alternative, Greek law.[2]

■ Federal choice of law principles determine the applicable law in maritime actions. *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 382–83, 79 S.Ct. 468, 485–86, 3 L.Ed.2d 368 (1959); *Sundance Cruises Corp. v. American Bureau of Shipping,* 7 F.3d 1077, 1081–82 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1399, 128 L.Ed.2d 72 (1994). In *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the Supreme Court held that conflicts between competing laws should be deter-

---

**2.** For purposes of the prior motion to dismiss that Judge Patterson denied, the parties agreed to assume that United States law applied. *Car-* *botrade SpA v. Bureau Veritas,* No. 92–1459, 1992 WL 367122, *7 n. 3 (S.D.N.Y. Nov. 20, 1992).

mined by "ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved." *Id.* at 582, 73 S.Ct. at 928; *see also Romero,* 358 U.S. at 383, 79 S.Ct. at 486 (in applying general federal maritime choice of law principles, "[t]he controlling considerations are the interacting interests of the United States and of foreign countries"). The *Lauritzen* Court determined that the following factors are relevant for such a determination: (1) the place of the wrongful act; (2) the law of the ship's flag; (3) the domicile of the injured party; (4) the domicile of the shipowner; (5) the place of contract; (6) the inaccessibility of the foreign forum; and (7) the law of the forum. 345 U.S. at 583–92, 73 S.Ct. at 928–33; *Sundance,* 7 F.3d at 1081.[3] In *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the Court noted that "the list of seven factors in *Lauritzen* was not intended as exhaustive," 398 U.S. at 309, 90 S.Ct. at 1734, and added the shipowner's base of operations as another relevant consideration.

■ Of all the relevant criteria, the application of the law of the flag to maritime causes of action is "[p]erhaps the most venerable and universal rule of maritime law." *Lauritzen,* 345 U.S. at 584, 73 S.Ct. at 929; *see also Hellenic Lines,* 398 U.S. at 308, 90 S.Ct. at 1734 ("the flag that a ship flies may, at times, alone be sufficient"); *Sundance,* 7 F.3d at 1082 (noting that the law of the flag " 'overbears most other connecting events in determining applicable law' ") (quoting *Lauritzen,* 345 U.S. at 585, 73 S.Ct. at 930). However, the law of the flag is given little weight when it is merely a flag of convenience. *See Lauritzen,* 345 U.S. at 587, 73 S.Ct. at 930–31 (flag law not as relevant when shipowner's choice of flag appears to be an attempt to avoid stringent shipping laws); *Sundance,* 7 F.3d at 1082 (noting that it would be inappropriate to apply the law of the flag when the flag country appears to be a sham). As the Court cautioned in *Hellenic Lines,* 398 U.S. 306, 90 S.Ct. 1731, "[t]he

*Lauritzen* test ... is not a mechanical one.... The significance of one or more factors must be considered in light of the national interest served by the assertion of [that nation's law]." *Id.* at 309, 90 S.Ct. at 1734. Accordingly, the *Lauritzen* factors are of variable importance depending upon the circumstances of the particular case. *Lauritzen,* 345 U.S. at 582, 73 S.Ct. at 928; *Romero,* 358 U.S. at 383, 79 S.Ct. at 486.

This action involves contacts with several countries. The alleged "wrongful act" occurred in Greece; the vessel flew the British flag and was registered in the U.K. dependency of Gibraltar; the plaintiff's domicile is Italy; the shipowner's domicile is Gibraltar; and the United States provides the forum. This case also has contacts with France, the domicile of the defendant B.V.; however, neither party contends that French law controls this case. The remaining *Lauritzen* factors are irrelevant in this action: the plaintiff's allegations sound in tort, not contract, and the inaccessibility of a foreign forum is not at issue.

The defendant argues that the significance of the British contacts indicates that British law applies. These contacts include the flag of the ship, the place of incorporation of the shipowner, and the arbitration clause in the main charter. The plaintiff responds that the law of the flag of the ship is irrelevant because it is a flag of convenience only, and the flag state has no real interest in this litigation because the shipowner is not a party to this suit. The plaintiff urges this Court to apply the law of the United States instead because this case has substantial contacts with this country.

■ When, as here, the *Lauritzen* factors "point indiscriminately to much of the globe," *Sundance,* 7 F.3d at 1082 (quoting *Sundance Cruises Corp. v. American Bureau of Shipping,* 799 F.Supp. 363, 387 (S.D.N.Y.1992), *aff'd,* 7 F.3d 1077 (2d Cir.1993), the law of the flag governs absent of proof that another nation has a more significant, countervailing interest. The plaintiff has made no such showing.

---

**3.** Although *Lauritzen* was a Jones Act case, the Court has since held that the *Lauritzen* factors also govern the applicability of general maritime law in tort actions. *See Romero,* 358 U.S. at 382, 79 S.Ct. at 485; *Sundance,* 7 F.3d at 1082.

Rather than being irrelevant, as the plaintiff argues, the law of the flag is particularly appropriate under the circumstances of this case because it is a unifying factor that can govern the potential liabilities of a classification society to third parties with whom the society has no direct contractual relations. Here, B.V. entered into its contract with the ship's owner, a Gibraltar corporation, and issued its classification certificate for a British flag vessel. B.V. had no direct relationship with any cargo interests who subsequently chartered the vessel from the ship's owner. B.V.'s relations were with the ship's owner and related to its classification of a British flag vessel. In addition, the vessel was subject to British manning laws. Numerous different cargo interests from around the world could potentially enter into charters or subcharters for the vessel. Without the certainty of the law of the flag, the law governing any potential liability to third parties would be indeterminate, requiring classification societies to take into account possible liabilities under an unlimited number of laws. *Compare Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 10 (2d Cir.1995) (upholding validity of forum-selection clause in passenger ticket, noting that because passengers hail from all 50 states as well as several foreign countries, the Greek cruise line "has a special interest in limiting the fora in which it potentially could be subject to suit' ") (quoting *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593–94, 111 S.Ct. 1522, 1527, 113 L.Ed.2d 622 (1991)). Although *Lauritzen* itself involved the law to be applied to a seaman injured on a vessel that sails around the world, its rationale that the law of the flag controls due to the practical difficulties of applying the laws of all the territories into which a ship sails is also true for potential liabilities by the classification society to third parties. Furthermore, this is not a case where the flag country is a "sham." Carbotrade has failed to offer any evidence that the shipowner selected a flag in order to avoid application of the laws of more stringent countries.

The plaintiff's argument that United States law should govern this case is not persuasive. Carbotrade contends that federal maritime law governs because Essex is a New Jersey-based partnership that used a New Jersey chartering broker, the defendant has several branch offices in the United States and conducts classification surveys of vessels at numerous United States ports, the STAR OF ALEXANDRIA was inspected four times at a United States port in the last ten years, the United States Coast guard was involved in rescue operations of the vessel, and the vessel sank in international waters off the coast of Massachusetts. Although it is clear that both the vessel and B.V. have had minimal contacts with the United States, such contacts only justify the exercise of personal jurisdiction over such parties, not the application of United States law. In addition, none of the contacts the plaintiff lists is relevant in this action. Neither party is based in the United States, and none of the significant events relating to the classification and loss of the vessel and the plaintiff's cargo occurred in the United States. This is an action by an Italian corporation against a French corporation alleging reliance on a classification certificate for a British vessel owned by a British company and inspected in Greece, and which sank in international waters. The only significant connection between this action and the United States is that the plaintiff brought the case here. This contact alone does not justify the application of United States law.[4]

■ The plaintiff half-heartedly argues in the alternative that Greek law should govern this action based on the theory of lex loci delicti commissi. The Supreme Court has explicitly stated, however, that the choice-of-law principles that govern maritime cases "do not depend upon a mechanical application

---

4. Indeed, as the Supreme Court has noted, the application of United States law under such circumstances quite possibly threatens the due process rights of the litigants. *Lauritzen*, 345 U.S. at 590, 73 S.Ct. at 932 ("We have held it a denial of due process of law when a state of the Union attempts to draw into control of its law otherwise foreign controversies, on slight connections, because it is a forum state.") (citing *Hartford Accident & Indemnity Co. v. Delta & Pine Land Co.*, 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178; *Home Ins. Co. v. Dick*, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926).

of a doctrine like that of lex loci delicti commissi." *Romero,* 358 U.S. at 383, 79 S.Ct. at 486. This standard "is so unfitted to an enterprise conducted under many territorial rules and under none that it usually is modified by the more constant law of the flag." *Lauritzen,* 345 U.S. at 584, 73 S.Ct. at 929. In this case, B.V. originally classed and subsequently has conducted surveys to reaffirm the class of the STAR OF ALEXANDRIA in a number of different places, including the United States, Japan, Gibraltar, Malta, and Greece. Tisdale Aff., Exh. 5 (copies of classification reports for the STAR OF ALEXANDRIA). B.V. renewed the classification of the STAR OF ALEXANDRIA for almost 30 years pursuant to surveys conducted in ports all over the world. Accordingly, third parties that charter this vessel may allegedly rely on this certification in any number of countries, exposing B.V. to numerous different laws. Lex loci delicti commissi is therefore clearly inappropriate for this sort of action.

In sum, the plaintiff has failed to demonstrate that the interests of any other country are sufficiently strong to rebut the presumption that the law of the flag applies. *See Lauritzen,* 345 U.S. at 585, 73 S.Ct. at 929–30 (the law of the flag applies "unless some heavy counterweight appears").

**IV.**

■ Under British law, the defendant is entitled to summary judgment. The present case falls squarely within the House of Lord's recent decision in *Marc Rich & Co. v. Bishop Rock Marine Co., Ltd. (The NICHOLAS H.)* (July 6, 1995), which held that a classification society does not owe a third-party cargo owner a duty of care capable of giving rise to liability for damages stemming from lost cargo.

Nothing about the current case distinguishes it from *NICHOLAS H.* If anything, the case for liability in *NICHOLAS H.* was stronger than in the present case. In *NICHOLAS H.,* a cargo owner sued the defendant classification society Nippon Kaiji Kyokai ("N.K.K.") in tort for the total loss of cargo on board the vessel NICHOLAS H. During its voyage, the NICHOLAS H. developed a crack in her hull. At the request of the United States Coast Guard, the vessel docked off the shore of Puerto Rico, where N.K.K. performed a survey of the damage. *NICHOLAS H.,* slip op. at 17. Although the surveyor recommended that the vessel be dry-docked for repairs, the shipowners persuaded the surveyor to permit temporary repairs instead. *Id.* After the temporary repairs were completed, the surveyor recommended that the vessel remain in class, thus permitting it to continue its journey across the Atlantic. *Id.* Soon after, the ship sank and the cargo was completely lost. *Id.* at 18. The cargo owner alleged that N.K.K. was responsible for the vessel's sinking and thus liable for the cargo loss because N.K.K. negligently permitted the ship to remain in class despite the crack in its hull.

The House of Lords declined to hold the classification liable. The House of Lords explained that in order to impose a duty of care, there must be (1) foreseeability of harm to the plaintiff; (2) an appropriate relationship between the parties; and (3) a situation in which it is "fair, just and reasonable to impose a duty of care." *Id.* at 21–22.

Lord Steyn points out in his opinion that "[i]n England no classification society, engaged by owners to perform a survey has ever been held liable to cargo owners on the ground of a careless conduct of any survey." *Id.* at 17. In the course of finding no liability for the classification society in *NICHOLAS H.,* Lord Steyn explained some of the policy reasons that argued against the imposition of such liability.

[I]f a duty of care is held to exist in this case, the potential exposure of classification societies to claims by cargo owners will be large. That greater exposure is likely to lead to an increase in the cost to classification societies of obtaining appropriate liability risks insurance. Given their role in maritime trade classification societies are likely to seek to pass on the higher costs to owners. Moreover, it is readily predicable [sic] that classification societies will require owners to give appro-

priate indemnities. Ultimately, shipowners will pay.

*Id.* at 26. Lord Steyn continued:

At present the system of settling cargo claims against shipowners is a relatively simply one. The claims are settled between the two sets of insurers. If the claims are not settled, they are resolved in arbitration or court proceedings. If a duty is held to exist in this case as between the classification society and cargo owners, classification societies would become potential defendants in many cases. An extra layer of insurance would become involved. The settlement process would inevitably become more complicated and expensive. Arbitration proceedings and court proceedings would often involve an additional party. And often similar issues would have to be canvassed in separate proceedings since the classification societies would not be bound by arbitration clauses in the contracts of carriage. if such a duty is recognised, there is a risk that classification societies might be unwilling from time to time to survey the very vessels which most urgently require independent examination. It will also divert men and resources from the prime function of classification societies, namely to save life and ships at sea. These facts are, by themselves, far from decisive. But in an overall assessment of the case they merit consideration.

*Id.* at 28. He concluded:

I conclude that the recognition of a duty would be unfair, unjust and unreasonable as against the shipowners who would ultimately have to bear the cost of holding classification societies liable, such consequence being at variance with the bargain between shipowners and cargo owners based on an internationally agreed contractual structure. It would also be unfair, unjust and unreasonable towards classifi-

cation societies, notably because they act for the collective welfare and unlike shipowners they would not have the benefit of any limitation provisions.

*Id.* at 29. This reasoning is equally applicable to the present case. As in *NICHOLAS H.*, the plaintiff in the current case has not presented evidence of any relationship between the cargo interests and B.V.; instead, liability is sought to be imposed based on Carbotrade's alleged foreseeable reliance on B.V.'s classification of the vessel. That is plainly insufficient under British law. It is clear that under British law B.V. would not qualify as the first classification society ever to have been held liable to cargo owners for performing an allegedly negligent survey when it was engaged by the shipowner.

## V.

Summary judgment for the defendants is also appropriate even if the general maritime law of the United States governs this action.[5] The Court of Appeals recently held that a classification society cannot be held liable in tort to a shipowner. *Sundance,* 7 F.3d at 1084. In *Sundance,* the Court of Appeals distinguished the case before it "from a suit brought by an injured third party who relied on the classification society or safety certificates." *Id.; see also International Ore & Fertilizer Corp. v. SGS Control Servs.,* 38 F.3d 1279, (2d Cir.1994) (discussing the scope of this exception and the tort of negligent misrepresentation), *cert. denied,* —— U.S. ——, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995). The issue then becomes whether this case falls within the possible exception to the nonliability rule left open in *Sundance.*

Although the *Sundance* court did not explicitly indicate the standards to be applied to assess potential third-party liability, the court cited the New York cases *Ultramares Corp. v. Touche et al.,* 255 N.Y. 170, 174 N.E.

---

**5.** The Court of Appeals has explicitly refrained from determining whether federal maritime law or state law should govern cases involving alleged negligent misrepresentation. *See International Ore & Fertilizer Corp. v. SGS Control Services, Inc.,* 38 F.3d 1279, 1283 n. 1 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995). In *International Ore,* the

Court held that it was unnecessary to make such a determination because "we believe that the disposition of this case would be the same under either federal maritime or New York law." *Id.* In the same opinion the court explicitly noted that the New York case *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922), reflects federal maritime law. *Id.* at 1284.

441 (1931) (Cardozo, J.) and *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922) (Cardozo, C.J.).[6] Both cases and their progeny indicate that the imposition of liability for negligent misrepresentations that are relied upon by parties who did not employ the defendant is only appropriate where there is a relationship approaching privity between the defendant and the third party.[7]

In *Glanzer,* the New York Court of Appeals found that one owes a duty to a third party when the third party's reliance "was a consequence which, to the [defendant's] knowledge, was the end and aim of the transaction." 233 N.Y. 236, 238–39, 135 N.E. 275. In that case, a bean seller contracted with the defendant, a public weigher, to certify the weight of goods that had been sold to the plaintiff. Pursuant to the bean seller's instructions, the public weigher provided copies of the weight certificate to both the seller and the buyer, who then made payment for the goods in reliance upon representations the bean weigher had made in the certificate. In permitting the buyer to sue the public weigher for negligence, the court held that the defendants

> "knew that the beans had been sold, and that on the faith of the certificate payment would be made. They sent a copy to the plaintiffs for the very purpose of inducing action. All this they admit. In such circumstances, assumption of the task of weighing was the assumption of a duty to weigh carefully for the benefit of all whose conduct was to be governed."

*Id.* at 239, 135 N.E. 275.

In *Ultramares,* the court refused to extend this noncontractual duty of care in *Glanzer* to public accountants who prepared reports that were later exhibited by the accountants' client to indeterminate parties. The court distinguished *Glanzer* on the following grounds:

> In *Glanzer v. Shepard,* [there] was something more than the rendition of a service in the expectation that the one who ordered the certificate would use it thereafter in the operations of his business as occasion might require. Here was a case where the transmission of the certificate to another was not merely one possibility among many, but the 'end and aim of the transaction.' ... Not so in the case at hand. No one would be likely to urge that there was a contractual relation, or even one approaching it, at the root of any duty that was owing from the defendants now before us to the indeterminate class of persons who, presently or in the future, might deal with the [accountants' client] in reliance on the audit. In a word, the service rendered by the defendant in *Glanzer v. Shepard* was primarily for the information of a third person, in effect, if not in name, a party to the contract, and only incidentally for that of the promisee.

255 N.Y. at 182–83, 174 N.E. at 445–446. The court concluded that the imposition of liability is appropriate only when the connection between the parties is "so close as to approach that of privity, if not completely one with it." *Id.*

Recent decisions of the New York Court of Appeals affirm this near-privity requirement. In *Credit Alliance Corp. et al. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985), *modified,* 66 N.Y.2d 812, 498 N.Y.S.2d 362, 489 N.E.2d 249 (1985), the New York Court of Appeals articulated the relevant factors for determining when an accountant can be liable, absent privity, to a third party who relies to his detriment on negligently prepared financial reports. Basing its holding on *Glanzer* and *Ultramares,* the court explained that before

---

**6.** The Court of Appeals recently affirmed that New York law, and *Glanzer* in particular, "reflects federal maritime law." *International Ore,* 38 F.3d at 1284.

**7.** This was also the type of relationship that the House of Lords left open in *NICHOLAS H.* as a possible basis for liability.
  "It is possible to visualize a direct exchange between cargo owners and a classification so-

ciety, in the context of a survey on behalf of owners of a vessel laden with cargo, which might give rise to an assumption of responsibility.... In the present case there was no contact whatever between these cargo owners and the classification society."
Slip op. at 24. As explained below, this case is also a case of absolutely no direct contact between the classification society and the plaintiff.

accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports:

> (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

*Id.* at 551, 493 N.Y.S.2d at 443, 483 N.E.2d at 118. These factors require a third party seeking recovery to demonstrate a relationship between the parties that is " 'sufficiently approaching privity' " to justify the imposition of liability. *Security Pacific Business Credit v. Peat Marwick Main & Co.,* 79 N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992) (quoting *Westpac Banking Corp. v. Deschamps,* 66 N.Y.2d 16, 19, 494 N.Y.S.2d 848, 484 N.E.2d 1351 (1985)); *see Credit Alliance,* 65 N.Y.2d at 545, 493 N.Y.S.2d at 440, 483 N.E.2d at 115 (a relationship approaching privity "remains valid as the predicate for imposing liability"). Liability to a third-party will not be imposed upon the basis of foreseeability only; there must be "actual conduct [by the defendant] linking [it] to the noncontractual party." *Credit Alliance,* 65 N.Y.2d at 553 n. 11, 493 N.Y.S.2d at 444 n. 11, 483 N.E.2d at 119 n. 11.

Here there was no conduct on the part of B.V. that linked it to the cargo owner. Accordingly, under the principles of *Glanzer* and *Ultramares,* which the Court of Appeals for the Second Circuit has relied upon for federal maritime law, B.V. owed no duty to the plaintiff and therefore cannot be liable to it for breaching such a duty. It is undisputed in this case that there was no communication between B.V. and the plaintiff that would link B.V. and the plaintiff and evince B.V.'s understanding of the plaintiff's alleged reliance. Accordingly, B.V. bears more resemblance to the accountants in *Ultramares* than the bean weigher in *Glanzer.* Although B.V. may have been aware that its class certificates are shown to third parties, in this case this possibility was " 'merely one possi-

bility among many,' " not " 'the end and aim of the transaction.' " *Credit Alliance,* 65 N.Y.2d at 549, 493 N.Y.S.2d at 442, 483 N.E.2d at 117 (quoting *Ultramares,* 255 N.Y. at 182, 174 N.E. 441). As the Second Circuit Court of Appeals recently held in *Sundance,* "the purpose of the classification certificate is not to guarantee safety, but merely to permit [the shipowner] to take advantage of the insurance rates available to a classed vessel." 7 F.3d at 1083; *see also* Tisdale Aff., Exh. 11 (Stavropoulos) at 2 (stating that owner wants ship to be in class so that ship can be insured). Because B.V. did not survey the STAR OF ALEXANDRIA primarily for the benefit of Carbotrade or Essex, it does not owe these parties a duty of care. As the court in *Sundance* noted, a contrary rule that allocated all risk of loss to the classification society would make it impossible for the ship classification industry to continue to exist. *Sundance,* 7 F.3d at 1084.

■ Finally, even if Bureau Veritas owed a duty to Carbotrade, which the Court finds it did not, Carbotrade could not recover on its claim of negligent misrepresentation unless there was evidence that it actually and reasonably relied on the classification certificate B.V. issued. *See Sundance,* 7 F.3d at 1084; *Glanzer,* 233 N.Y. at 242, 135 N.E. at 277. To make this showing, the plaintiff must establish that the defendant: "(1) at plaintiff's request, supplied information for it's guidance; (2) failed to use reasonable care in so doing; (3) knew plaintiff[s] would rely on the information for particular purposes; and (4) plaintiff suffered an economic loss because it relied on the information." *Sundance,* 799 F.Supp. at 382, *aff'd,* 7 F.3d 1077.

Carbotrade has failed to establish that it actually relied on B.V.'s classification of the STAR OF ALEXANDRIA. The plaintiff's claim of reliance is undercut by the fact that the cargo interests accepted the Notice of Readiness and began loading cargo on March 21, 1989, several days before B.V. had completed the intermediate survey and extended the vessel's certification. In fact, the most recent visa extending the deadline for a dry dock bottom survey had expired on March 20, 1989, a day before the date the plaintiff began to load the cargo aboard the vessel,

and was not extended again until March 28, 1989, when the loading was virtually complete. Furthermore, even if the cargo interests' independent surveyor reviewed the certificate on March 28, 1989, as Carbotrade claims, it is undisputed that the surveyor was aware of the leakage in the wing tanks and had authority under the charter to fail the vessel for inspection. Under the terms of the head charter and the subcharter, the chartering parties had a right to refuse the vessel after their own surveyor inspected the cargo areas, but they did not do so. In this case, the plaintiff was fully aware of the ship's defects and had an opportunity to remedy them, but instead chose to do nothing. *See Great American Ins. Co. et al. v. Bureau Veritas,* 338 F.Supp. 999, 1011 (S.D.N.Y. 1972) (rejecting a negligent misrepresentation claim against a classification society because the vessel's owner and charterer had "knowledge and opportunity to remedy the defects" but "elected to do nothing"). Therefore, the defendant is entitled to judgment as a matter of law that the plaintiff did not rely on the defendant's representations.

## VI.

For the reasons stated above, the defendant's motion for summary judgment is granted. The Clerk of the Court is directed to enter such a judgment and to close the above-captioned action.

**SO ORDERED.**